PEOPLE v CATANIA

Docket Nos. 76742, 76743. Argued April 10, 1986 (Calendar No. 7).
    Decided December 30, 1986. Rehearing denied 428 Mich 1206.

Donald Catania was convicted by a jury in the Berrien Circuit
    Court, Chester J. Byrns, J., of possession of cocaine with intent
    to deliver and of possession of marijuana with intent to deliver,
    second offense. The Court of Appeals, M. J. KELLY and MULLEN,
    JJ. (J. H. GILLIS, P.J., dissenting), reversed, holding that evi-
    dence obtained as a result of an undercover agent's ruse entry
    into the defendant's home without a warrant should have been
    suppressed because his consent to the entry was not voluntary
    and knowing (Docket No. 71452). The people appeal.

    In an opinion by Justice BOYLE, joined by Chief Justice
    WILLIAMS and Justice RILEY, the Supreme Court *held:*

    Where entry into a defendant's home by an undercover agent
    is effected solely by the invitation of the defendant, albeit
    under a misconception as to the agent's identity and purpose,
    there is no invasion of interest protected from unreasonable
    search and seizure by the state or federal constitutions, so long
    as the agent does not exceed the scope of the invitation.

    1. Neither a warrant nor probable cause is required where
    police obtain a suspect's consent to a search. Likewise, what a
    person knowingly exposes to the public, even in the person's
    home or office, is not a subject of constitutional protection; nor
    is a wrongdoer protected from misplaced confidence in associ-
    ates. The test for determining whether governmental activity
    infringes upon a protected interest is whether the defendant
    had a reasonable expectation of privacy in the object of the
    challenged search: i.e., whether the defendant manifested a
    subjective expectation of privacy, and whether the expectation
    was one that society is prepared to recognize as reasonable. In

REFERENCES

Am Jur 2d, Searches and Seizures §§ 1 *et seq.,* 46 *et seq.,* 84, 88, 90.
Officer's ruse to gain entry as affecting admissibility of plain-view
    evidence—Modern cases. 47 ALR4th 425.
See also the annotations in the Index to Annotations under Search
    and Seizure.

this case, there is no basis for holding that Const 1963, art 1, § 11, affords greater protection than the federal constitution.

2. An undercover police officer may legitimately obtain an invitation into a house by misrepresentation of identity and purpose. Once inside, so long as the scope of the invitation is not exceeded, the officer does not require a warrant to observe activities within plain view. A distinction between ruse entries where illegal purposes are apparent at the inception and entries with apparently legitimate purposes does not determine the validity of the entry.

3. In this case, the entry of the undercover officer into the defendant's house with his permission under the guise of seeking help for a disabled automobile was not a search under the Fourth Amendment or art 1, § 11. The officer did not exceed the scope of the invitation extended by the defendant. No forcible entry was effected or attempted by exercise of governmental authority. The defendant had no reasonable expectation of privacy in the activities to the extent he voluntarily exposed them to the agent. Because no search occurred, no warrant was required, and no showing of probable cause was necessary.

Justice BRICKLEY concurred in the result only.

Justice LEVIN, concurring, stated that the defendant's conviction should be reinstated because the evidence that formed the basis for the defendant's conviction was obtained not as a result of a search without a warrant, but as a result of the defendant's misplaced confidence in an undercover agent. The enticement of the defendant by the agent should be analyzed in terms of the defense of entrapment and not in terms of search and seizure law.

Reversed and remanded.

Justice ARCHER, joined by Justice CAVANAGH, dissenting, stated that before a ruse entry into a person's home without a warrant can withstand constitutional challenge there must be a showing that there was a rational basis to suspect criminal activity within the home. Such entries which are not based on objective and articulable facts that suspected criminal activity has taken or is taking place constitute arbitrary intrusions.

140 Mich App 755; 366 NW2d 38 (1985) reversed.

1. SEARCHES AND SEIZURES — UNDERCOVER OFFICERS — RUSE ENTRIES.
    Where entry into a defendant's home by an undercover agent is effected solely by the invitation of the defendant, albeit under a misconception as to the agent's identity and purpose, there is no invasion of interest protected from unreasonable search and seizure by the state or federal constitution, so long as the agent

does not exceed the scope of the invitation (US Const, Am IV; Const 1963, art 1, § 11).

2. SEARCHES AND SEIZURES — REASONABLE EXPECTATION OF PRIVACY.

The test for determining whether governmental activity with respect to a challenged search infringed upon a protected interest is whether the defendant had a reasonable expectation of privacy in the object of the search: i.e., whether the defendant manifested a subjective expectation of privacy, and whether the expectation was one that society is prepared to recognize as reasonable (US Const, Am IV; Const 1963, art 1, § 11).

3. SEARCHES AND SEIZURES — UNDERCOVER OFFICERS — RUSE ENTRIES.

An undercover police officer may legitimately obtain an invitation into a house by misrepresentation of identity and purpose; once inside, so long as the scope of the invitation is not exceeded, the officer does not require a warrant to observe activities within plain view (US Const, Am IV; Const 1963, art 1, § 11).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Paul L. Maloney,* Prosecuting Attorney, and *John T. Burhans,* Assistant Prosecuting Attorney, for the people.

*Jesse & Jesse* (by *James K. Jesse*) for the defendant.

BOYLE, J. In this case, an undercover police agent obtained entry into the defendant's home by feigning car trouble and asking to use the telephone. During the half-hour that the agent was in the home, the defendant offered her marijuana which the two smoked. The agent left, and a search warrant was obtained on the basis of evidence of criminal activities obtained by the agent while in the home. The Court of Appeals held that probable cause was required to support a ruse entry such as the one in this case. Because we find no violation of the Michigan or the United States Constitution, we reverse.

I

FACTS

On March 10, 1981, the Berrien County Metro Narcotics Squad sent JoAnn Ward, an attractive young undercover police informant, to Donald Catania's home to attempt to purchase drugs. She had been told that there was possible drug trafficking at his residence. Ward had worked as an informant at least thirty times before.

Around 7:30 P.M., Ward knocked at Catania's back door and asked to use his telephone because of feigned car problems. She also gave a fictitious name for herself. After using the telephone, she said that she was on her way to a party, her car had overheated, and she just needed a little bit of time for it to cool down. After discussing the fact that she was going to a party and its location, Catania suggested that if she wanted to, they could smoke a "joint." At that point, the defendant walked over to the kitchen counter and produced a tray upon which there was a plastic baggie containing suspected marijuana, a "roach clip," and some cigarette rolling papers. He then rolled a cigarette of suspected marijuana and smoked it with Ward. While "smoking" the cigarette,[1] Ward asked the defendant if he lived at that house by himself, to which he replied, "Yeah."

Before Catania produced the tray of marijuana, Ms. Ward had not discussed or asked for any drugs. The defendant initiated the talk about marijuana. Ward did not look for or see any marijuana before the defendant produced the tray.

After smoking the cigarette, Ward asked if she could possibly get a couple of "joints" for the road. The defendant declined because he didn't have

---

[1] Ms. Ward testified that she merely simulated smoking the marijuana.

enough. Ward then asked if he knew whether there was any "coke" (cocaine) around, to which the defendant replied, "What do you think you fell into here?" Ward and defendant had some discussion about her possibly meeting him at a bar the next evening. She was in the defendant's residence for a total period of approximately one-half hour.

On the basis of the information obtained by Ward, a complaint, affidavit, and search warrant were prepared by the Metro Narcotics Squad. Upon searching his home, the police found a variety of incriminating evidence: a large garbage bag filled with a bale of marijuana, a plastic bag of cocaine, several thousands of dollars in cash, and various drug paraphernalia.[2] This evidence was

---

[2] After Mr. Catania had been warned of his *Miranda* rights (*Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 [1966]), he unsuccessfully tried to get the arresting officer's help in surreptitiously disposing of the evidence:

*Q.* Subsequent to that, did Mr. Catania make any statement to you?

*A.* Well, immediately after that he said that he would tell us —or say anything that he wanted to say, and after that there was no conversation until he was taken outside. I, myself and Deputy Gast, who was assisting us there at the scene, took him outside the door and Deputy Gast went to get the patrol car to bring it up to the door to take Mr. Catania away.

We were standing outside the residence and Mr. Catania looked at me and said something to the effect, "You look pretty cool, can you help me out?" I said, "What are you talking about?" Also, I said—he was giving us a hard time and arguing with us a lot and prior to that I told him, "Hey, be cool, just don't argue with us and don't give us a bad time and everything is going to be all right." He said, "You look pretty cool, can you help me out?" And I says, "What do you mean?" He says, "There's some shit in my bedroom." I said, "What do you mean shit?" He says, "Grass. Can you get it out of there for me?" I said, "I am a police officer, don't say anything more to me because it will be used against you in a court."

At that time he was taken to the patrol car and put in.

*Q.* At the time that you said that he should not say anything further to you because you were a police officer, did he make any response to that?

*A.* Yes. Do you want his exact words?

admitted at Catania's trial, and he was convicted by a jury of one count of possession with intent to deliver cocaine and one count of possession with intent to deliver marijuana.

Defendant claims that his consent to Ms. Ward's entry into his home was not voluntary and knowing and that Ms. Ward's presence in his home was an unconstitutional search without a warrant. Therefore, Catania urges that the fruits of the search—the evidence obtained pursuant to a warrant based upon Ms. Ward's investigation—be suppressed. A split panel of the Court of Appeals agreed. *People v Catania*, 140 Mich App 755; 366 NW2d 38 (1985). Because we find no violation of the Michigan and United States Constitutions, we reverse the decision of the Court of Appeals and reinstate the defendant's conviction.

II

The initial focus is upon whether either the Fourth Amendment of the United States Constitution or Const 1963, art 1, § 11 is implicated in this case. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . . [US Const, Am IV.]

The analogous provision of the Michigan Constitution provides:

> The person, houses, papers and possessions of every person shall be secure from unreasonable

*Q.* What did he say?
*A.* He said, "Well, fuck it then."

searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state. [Const 1963, art 1, § 11.]

Under "black letter" search and seizure law, a search without a warrant is considered unreasonable per se, and thus is invalid, unless it falls within "a few specifically established and well-delineated exceptions."[3] *Mincey v Arizona,* 437 US 385, 390; 98 S Ct 2408; 57 L Ed 2d 290 (1978).

One situation in which neither a warrant nor probable cause is required is where the police obtain the suspect's consent to a search. In *Schneckloth v Bustamonte,* 412 US 218; 93 S Ct 2041; 36 L Ed 2d 854 (1973), the Court considered the nature of consent required under the constitution where known police agents conducted a search without a warrant after obtaining the permission of the suspect. Rejecting a requirement that the suspect make "an intentional relinquishment or abandonment of a known right," *id.,* p 235, the Court held that a showing of traditional voluntariness was sufficient:

[W]hen the subject of a search is not in custody and the State attempts to justify a search on the

[3] Current commentators dispute this description of the warrant exceptions, and instead argue that they are many rather than few, and cloudy rather than clear. See, e.g., Haddad, *Well-delineated exceptions, claims of sham, and fourfold probable cause,* 68 J Crim L & Criminology 198 (1977) (cited in Grano, *Perplexing questions about three basic Fourth Amendment issues: Fourth Amendment activity, probable cause, and the warrant requirement,* 69 J Crim L & Criminology 425, 428, n 31 [1978]).

basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances . . . . [*Id.,* pp 248-249.]

The primary concern of the *Schneckloth* Court was to ensure the suspect's freedom from governmental coercion in agreeing to the search. *Id.,* p 228.

In cases where the government agent is undercover, the government coercion about which the *Schneckloth* Court was concerned is not present. Indeed, while *Schneckloth* assumed that a search occurred, commentators on the type of undercover activities involved in this case differ on whether a consensual ruse entry removes the activity from the protection of the Fourth Amendment altogether (no search) or is an exception to the warrant requirement. See, e.g., Gardner, *Consent as a bar to Fourth Amendment scope—A critique of a common theory,* 71 J Crim L & Criminology 443, 443-444 (1980); Warner, Comments, *Governmental deception in consent searches,* 34 U Miami L R 57 (1979). We believe that in cases of this sort, where entry by an undercover agent is effected solely by the invitation of the defendant, albeit under a misconception as to the agent's identity and purpose, there is no Fourth Amendment or Const 1963, art 1, § 11, activity so long as the agent does not exceed the scope of the invitation. The majority of courts considering this question agree. See, generally, Anno: *Officer's ruse to gain entry as affecting admissibility of plain-view evidence— Modern cases,* 47 ALR4th 425, § 2(a).

A review of the relevant United States Supreme

Court cases supports this view.[4] *Hoffa v United States,* 385 US 293; 87 S Ct 408; 17 L Ed 2d 374 (1966), most clearly parallels the instant case. Partin, one of Hoffa's Teamster associates, became a government informant. Under guise of friendship, Partin was privy to ostensibly private conversations in Hoffa's hotel suite in which Hoffa planned to bribe the jurors in his trial for jury tampering. Partin relayed the conversations to the government and testified against Hoffa in the subsequent trial for jury tampering. A four-member majority[5] in *Hoffa* found that there was no Fourth Amendment activity involved. Justice Stewart first described the scope of Fourth Amendment protection:

> What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. There he is protected from unwarranted governmental intrusion. [*Id.,* p 301.]

Then Justice Stewart turned to the crux of the Fourth Amendment consent question and said, "Neither this Court nor any member of it has ever

---

[4] The dissent's reliance upon *Berger v New York,* 388 US 41; 87 S Ct 1873; 18 L Ed 2d 1040 (1967), is misplaced. *Berger* dealt with a New York eavesdropping statute which was invalidated because it allowed searches and seizures based upon warrants which did not "'particularly describ[e] the place to be searched, and the persons or things to be seized.'" US Const, Am IV; *Berger, supra,* pp 55-60. The Court particularly noted that the flaws of the New York statute occurred within the context of an *unconsented* entry: "[I]t permits unconsented entry without any showing of exigent circumstances." *Id.,* p 60. Since the instant case involves a *consensual* entry, *Berger* is not on point. There is no debate that an unconsented entry requires either a warrant or an exception to the warrant requirement.

[5] Justices Stewart, Brennan, Harlan, and Black joined in the opinion of the Court. Chief Justice Warren dissented separately, while Justices Clark and Douglas believed that certiorari had been improvidently granted. Justices White and Fortas did not participate. The opinion of the Court was thus that of a four-person majority.

expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.,* p 302. The *Hoffa* opinion essentially held that citizens assume the risk that their associates may be undercover agents. *Id.,* p 302.

In *Lewis v United States,* 385 US 206; 87 S Ct 424; 17 L Ed 2d 312 (1966), a case decided the same term as *Hoffa,* the Court rejected the argument that, absent a warrant, "any official intrusion upon the privacy of a home constitutes a Fourth Amendment violation and that the fact the suspect invited the intrusion cannot be held a waiver when the invitation was induced by fraud and deception." *Id.,* p 208. The brief majority opinion by Chief Justice Earl Warren focused on the specific facts of the *Lewis* case and held that there was no search because Lewis had converted his home into a commercial center, inviting clients to enter to conduct illegal business, and the agent had seen nothing that Lewis had not intended the agent to see. *Id.,* p 210.

The next term, the Court considered the scope of Fourth Amendment protections, reaffirming the *Hoffa* and *Lewis* results. In *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), the Court abandoned the physical trespass test[6] for determining interests protected under the Fourth

---

[6] [F]or some years the Court was of the view that for there to be a Fourth Amendment search there must have been a physical intrusion into a "constitutionally protected area." These areas were those enumerated in the Fourth Amendment itself: "persons," including the bodies and attire of individuals; "houses," including apartments, hotel rooms, garages, business offices, stores, and warehouses; "papers," such as letters; and "effects," such as automobiles. [1 LaFave & Israel, Criminal Procedure, § 3.2(a), p 162. Citations omitted.]

Amendment. Instead, the Court held that government monitoring of telephone calls made from a public telephone booth was a search requiring a warrant under the Fourth Amendment because the monitoring violated Katz' reasonable expectation of privacy. The currently accepted test[7] for determining whether governmental activity infringes upon a protected interest is set forth in Justice Harlan's concurrence in *Katz:*

> [T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." [*Id.,* p 361.][8]

The first requirement, a subjective actual expectation of privacy, is clearly implicated in cases like the one at bar. The *Katz* majority observed that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id.,* p 351 (citing *Lewis*). Justice White, concurring in *Katz,* observed in a footnote:

> When one man speaks to another he takes all

[7] See, e.g., *California v Ciraolo,* 476 US —, —; 106 S Ct 1809, 1811; 90 L Ed 2d 210, 215 (1986):

> The touchstone of Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz v United States,* 389 US 347, 360 (1967) (Harlan, J., concurring). *Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable? See *Smith v Maryland,* 442 US 735, 740 [99 S Ct 2577; 61 L Ed 2d 220] (1979).

[8] Ironically, Justice Harlan would later retreat from the test which became the basis of later opinions. See *United States v White,* 401 US 745, 768-795; 91 S Ct 1122; 28 L Ed 2d 453 (1971) (Harlan, J., dissenting) and n 8.

the risks ordinarily inherent in so doing, including
the risk that the man to whom he speaks will
make public what he has heard. The Fourth
Amendment does not protect against unreliable (or
law-abiding) associates. [*Id.,* p 363. Citing *Hoffa.*]

The choice of Hoffa and Lewis to open their otherwise private areas to the view of an undercover
informant can be thus viewed as creating an area
outside the protection of the Fourth Amendment.

In *United States v White,* 401 US 745; 91 S Ct
1122; 28 L Ed 2d 453 (1971), the United States
Supreme Court once again faced the question of
evidence obtained by undercover government
agents. In *White,* a government informant wore a
concealed radio transmitter which enabled his
conversations with the defendant to be monitored
by government agents. One conversation occurred
in the defendant's home, one in a restaurant, and
the rest in either the informant's car or home.
When the informant was unavailable to testify at
trial, the agents who monitored the conversations
were allowed to testify. The question in *White* was
whether the electronic transmittal of the conversations was invalid under the Fourth Amendment.
Again the Court upheld the activity, while failing
to achieve agreement on why the activity was
permissible.

Justice White's plurality opinion[9] affirmed the
validity of *Hoffa's* conclusion that citizens assume
the risk that their associates may be government

[9] Chief Justice Burger and Justices Stewart and Blackmun joined in
Justice White's opinion. Justice Black concurred in the result because
intangibles like the spoken word were, in his view, outside the
protection of the Fourth Amendment. 401 US 754 (citing Justice
Black's dissent in *Katz, supra,* p 364). Justice Brennan concurred in
the *White* result because, in his view, *Katz* was inapplicable to
behavior which occurred before the decision in *Katz,* p 755. However,
Justice Brennan observed that after *Katz* any electronic monitoring
should require a warrant. *Id.,* pp 755-756.

informants and that communications made to such agents are not within the protection of the Fourth Amendment:

> *Hoffa v United States,* 385 US 293 (1966), which was left undisturbed by *Katz,* held that however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities. In these circumstances, "no interest legitimately protected by the Fourth Amendment is involved," for that amendment affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v United States,* at 302. No warrant to "search and seize" is required in such circumstances, nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused, *Lewis v United States,* 385 US 206 (1966), or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence. *Lopez v United States,* 373 US 427 [83 S Ct 1381; 10 L Ed 2d 462] (1963). [*Id.,* p 749.]

Since such encounters could constitutionally be written down or otherwise communicated by the agent to outsiders under the Court's earlier opinions, Justice White reasoned that the simultaneous electronic broadcast of a conversation by a consenting participant to outside listeners was no different in a constitutional sense. *Id.,* pp 751-752. The risk assumed is essentially the same:

> Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police. If he sufficiently doubts

their trustworthiness, the association will very probably end or never materialize. But if he has no doubts, or allays them, or risks what doubt he has, the risk is his. In terms of what his course will be, what he will or will not do or say, we are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other. [*Id.*, p 752.]

Furthermore, the plurality was "not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question."[10] *Id.*, p 753.

[10] In an extensive dissent, Justice Harlan apparently repudiated the subjective expectation test of *Katz* for protected areas of privacy. In his view, third-party electronic monitoring requires a warrant even if a participant to the conversation consents. *Id.*, p 769. Criticizing the plurality's "risk analysis," Harlan wrote that "[t]he analysis must, in my view, transcend the search for subjective expectations or legal attribution of assumptions of risk." *Id.*, p 786. The subjective expectations of the citizenry, based upon "the customs and values of the past and present," *id.*, should not restrict the protection of the Fourth Amendment. Instead, in Harlan's view, "[t]he critical question, therefore, is whether under our system of government, as reflected in the Constitution, we should impose on our citizens the risks of the electronic listener or observer without at least the protection of a warrant requirement." *Id.* To make this determination, Harlan suggested a balancing test:

This question must, in my view, be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement. For those more extensive intrusions that significantly jeopardize the sense of security which is the paramount concern of Fourth Amendment liberties, I am of the view that more than self-restraint by law enforcement officials is required and at the least warrants should be necessary. [*Id.*, pp 786-787.]

In Harlan's view, the balancing resulted in a warrant requirement for third-party eavesdropping because the effect on privacy was far greater than that involving informants, even those who recorded their own conversations. Justices Douglas and Marshall also dissented separately in *White.*

Since the spate of undercover cases which surfaced between 1966 and 1970, the United States Supreme Court has not directly faced the problem of the instant case. However, later cases indicate that the *Hoffa* and *White* assumption of risk analyses are valid in determining whether there is an invasion of a reasonable expectation of privacy. See, e.g., *Smith v Maryland,* 442 US 735; 99 S Ct 2577; 61 L Ed 2d 220 (1979) (no reasonable expectation of privacy in the numbers dialed on a home telephone) (five-member majority); *United States v Miller,* 425 US 435, 442-444; 96 S Ct 1619; 48 L Ed 2d 71 (1976) (no reasonable expectation of privacy in bank records) (seven-member majority). The various federal circuits and several state courts, however, have recently dealt with the validity of evidence obtained via a ruse entry without a warrant where the deceit involves the agent's purpose as well as identity.

Generally, the federal circuit courts of appeal have upheld evidence obtained by virtue of ruse entries effectuated by undercover agents. Several circuits have rejected the very argument made in this case: that where entry is obtained by governmental deception concerning identity *and* the "purpose" of the entry, the entry is an unconstitutional search, and the fruits of the entry must be suppressed. For example, in *United States v Wright,* 641 F2d 602 (CA 8, 1981), the court upheld evidence obtained by a warrant supported with evidence of narcotics activity seen when the defendant opened his motel room to help the government agents who had claimed they were having car trouble. Likewise, in *United States v Scherer,* 673 F2d 176 (CA 7, 1982), the court upheld a search based upon evidence of firearm violations seen while undercover agents of the Bureau of Alcohol, Tobacco and Firearms were on the prop-

erty purportedly to build duck blinds. In *United States v Baldwin,* 621 F2d 251 (CA 6, 1980), the court approved evidence obtained by an undercover agent who lived in the defendant's home as an employee/associate of the defendant.

In approving these ruse entries, the courts noted that the Fourth Amendment "does not protect wrongdoers from misplaced confidence in their associates," *id.,* p 252; that the defendants invited the agents to enter and, without exceeding the scope of the invitations, the agents saw illegal activities or evidence of such; *Scherer, supra,* p 182; *Wright, supra,* p 604. Because the agents saw only the illegal activities which were revealed by the defendants or which were in the plain view of the agents while within the scope of the invitations, there was no Fourth Amendment activity: "What a person knowingly exposes to the public even in his own home or office, is not a subject of Fourth Amendment protection." *Wright, supra,* p 604 (quoting *Katz*). In *Wright,* the court quoted from a Ninth Circuit case finding no Fourth Amendment violation where an undercover agent entered allegedly to set up a narcotics deal:

> [A]n officer may legitimately obtain an invitation into a house by misrepresenting his identity . . . . If he is invited inside, he does not need probable cause to enter, he does not need a warrant, and, quite obviously, he does not need to announce his authority and purpose. Once inside the house, he cannot exceed the scope of his invitation by ransacking the house generally, but he may seize anything in plain view. [*Wright, supra,* p 604. Quoting *United States v Glassel,* 488 F2d 143, 145 (CA 9, 1973). Citations omitted.]

Thus, these federal courts rejected arguments that ruse entries were invalid under the Fourth Amendment merely because the agents had en-

gaged in deceit vis-à-vis the alleged purpose of the entry as well as their identities.[11]

In *State v Poland,* 132 Ariz 269; 645 P2d 784 (1982), the Supreme Court of Arizona considered whether evidence obtained via a ruse entry without a warrant by undercover agents who entered for an ostensibly legitimate purpose was validly admitted. During surveillance of Poland's home, the agents learned that the home Poland was renting was for sale. They contacted the realtor and, posing as prospective buyers, toured the home. During that tour, evidence was obtained which was used to furnish probable cause for a search warrant. *Id.,* p 277. The Arizona court rejected the assertion that an agent's initial entry violated the Fourth and Fourteenth Amendments because it was effected by "misrepresenting his identity and purpose . . . ." *Id.* In the view of that court, the true purpose of an undercover agent's entry is *always* different than the suspect believes;

---

[11] Other variations have been considered, with varying results. Where the government agent is known as a government agent by the defendant, but the agent obtains evidence by deceiving the defendant as to the agent's purpose, the Fifth Circuit has suppressed the evidence where the agent intentionally deceived the defendant. See, e.g., *Alexander v United States,* 390 F2d 101 (CA 5, 1968). In recent cases, the Fifth Circuit has upheld admission of evidence where a determination is made that, under a totality of the circumstances, the consent to allow a search by a known government agent was voluntary despite being induced by deceit. See *United States v Davis,* 749 F2d 292 (CA 5, 1985); *United States v Andrews,* 746 F2d 247 (CA 5, 1984).

In the more "typical" situation involving an undercover agent who obtains evidence in the course of pursuing avowedly illegal purposes, the courts generally uphold admission of the evidence as obtained due to the defendant's "misplaced confidence." See, e.g., *United States v Haden,* 397 F2d 460 (CA 7, 1968) (drugs taken from defendant's car at defendant's direction); *United States v Glassel, supra* (cocaine purchase); *United States v Harris,* 713 F2d 623 (CA 11, 1983) ("narcotics meet" at defendant's home). When the evidence is obtained via a search that exceeds the scope of the invitation, the evidence is suppressed. See, e.g., *United States v Lyons,* 227 US App DC 284; 706 F2d 321 (1983); *Gouled v United States,* 255 US 298, 306; 41 S Ct 261; 65 L Ed 647 (1921).

the proper question is whether the government
intrusion stays within the scope of the suspect's
consent:

> [D]efendant's reliance on the purpose as the
> distinguishing factor between permissible and im-
> permissible searches is, we believe, misplaced. In
> the case of a deceitful entry, the law enforcement
> agent's purpose will, by definition, be different
> than that contemplated by the suspect. In the
> instant case, the agent may see only what any
> prospective buyer would expect to see. *To hold
> that the validity of the search in the case of
> deceitful entry depends upon whether the purpose
> of the agent in entering the premises was the
> same as the reason the suspect allowed him to
> enter, would make all deceitful entry searches
> unconstitutional.* The distinction, then, between
> permissible and impermissible intrusions turns on
> what the suspect, as a result of the agent's deceit,
> has chosen to show to the one entering the prem-
> ises. [*Id.,* pp 277-278. Emphasis added.]

Although the Arizona court reversed the convic-
tion on other grounds, the evidence obtained via
ruse entry was thus upheld because, under *Katz,*
" '[w]hat a person knowingly exposes to the public,
even in his own home or office, is not a subject of
Fourth Amendment protection.' " *Id.,* p 278 (citing
*Katz, supra*). See also *People v Nisser,* 189 Colo
471; 542 P2d 84 (1975). But see *State v Ahart,* 324
NW2d 317 (Iowa, 1982) (ruse entry requires justifi-
able and reasonable belief that criminal activity is
occurring) and *Guidry v State,* 671 P2d 1277 (Alas,
1983) (search upheld where no moral or legal
compulsion occurred, entry to home was not in-
tended, officers did not exceed scope of invitation,
and the entry was not a random canvass).

### III

In this case, Donald Catania invited agent Ward

into his kitchen. Ward did not use any exercise of governmental power or authority to effect her entry. While in Catania's home, Ward did not exceed the boundaries of the invitation extended to her. Catania displayed marijuana to Ward and invited her to smoke it with him. Under these circumstances, no search under the Fourth Amendment to the United States Constitution or art 1, § 11 of the Michigan Constitution occurred.

Donald Catania invited JoAnn Ward into his home and exposed his possession of marijuana to her. In *Katz v United States, supra,* p 351, the United States Supreme Court observed that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Catania knowingly exposed marijuana to JoAnn Ward. The only thing that Catania did not know was that Ward was an undercover police informant. Should this Court invalidate the later search on this basis? We believe not. In *Hoffa v United States, supra,* p 302, the four-member majority opinion noted that "[n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." So, too, in this case, Donald Catania's misplaced belief that JoAnn Ward would not reveal his illegal activities is not protected by the United States or Michigan Constitutions. Catania, upon inviting Ward into his home, no longer had a reasonable expectation of privacy in what he revealed to her. In the *Katz* dichotomy, he no longer had either a subjective expectation of privacy or one that society recognizes as protected.

We agree with the observation of the Arizona Supreme Court in *State v Poland, supra,* that a

distinction between ruse entries where illegal pur-
poses are apparent at the inception and entries
with apparently legitimate purposes does not de-
termine the validity of the entry. Even where an
undercover agent purportedly enters for an
avowedly illegal purpose, the *true* purpose of the
agent—gathering evidence to convict those in-
volved in the criminal activities—is, ideally, al-
ways concealed. The only reason for requiring an
undercover agent to give "notice" ahead of time of
an interest in the defendant's illegal activities
would be to give the defendant a "head start" on
the search and seizure "game."

There is no basis in this case for holding that
the Michigan Constitution, art 1, § 11, permits
greater protection than the United States Consti-
tution.[12] In *People v Smith,* 420 Mich 1, 20-28; 360
NW2d 841 (1984), this Court adopted the "reason-
able expectation of privacy" standard of *Katz* to
define the interests protected under Const 1963,
art 1, § 11. We find no basis in Const 1963, art 1,
§ 11 to conclude that Mr. Catania had a reasonable
expectation of privacy in the activity he engaged
in in Ms. Ward's presence. In the instant case,
Donald Catania assumed a risk when he offered
drugs to a total stranger that she would communi-
cate what she saw to the world. Since no persua-
sive reason has been advanced to interpret Const
1963, art 1, § 11 as prohibiting the activities al-

[12] In a recent decision, the Washington Supreme Court set out the
following criteria to guide the bench and bar in determining whether
the state constitution provided an independent protection for the
individual rights of citizens: 1) the textual language of the state
constitution, 2) significant textual differences in parallel provisions of
the federal and state constitutions, 3) state constitutional and com-
mon-law history, 4) state law preexisting the constitutional provision,
5) structural differences between the federal and state constitutions,
and 6) matters of particular state interest or local concern. *State v
Gunwall,* 106 Wash 2d 54, —; 720 P2d 808, 811-813 (1986). Similar
considerations would aid this Court in future cases in determining the
proper independent scope of our state constitution.

lowed in this case under the Fourth Amendment,[13] we decline such an interpretation in this case. See *People v Nash,* 418 Mich 196, 208-215; 341 NW2d 439 (1983).

The trial court, denying the defendant's motions to suppress, applied the proper legal reasoning to the facts of this case:

> There is an old adage that a secret is no longer a secret when more than one person knows it. A person's secret and his privacy in regards thereto can be made public by his own voluntary actions.
>
> Now, when a person voluntarily allows another person into his home, he waives secrecy and his privacy sofar as what that person may observe within the scope of the permission given. He takes that person for what he or she actually is; a "gossip," a "snitch," or in this case, an undercover agent. At that point, of course, upon entry, the plain view doctrine applies.
>
> However, in the case before us, based on the record, the marijuana was not originally in plain view, but it was later voluntarily placed in plain view by Mr. Catania as a part of his hospitality. There is no evidence that at any time the undercover agent in anyway exceeded this scope of the permission given her, such as going into another room, opening a drawer or some similar action, or that she took anything out of the house.
>
> Likewise, this is not a case where entry was obtained by use of some governmental force, such as the undercover agent posing and claiming right to entry as a building inspector. In fact, there was no assertion of right, contractual, governmental or otherwise, to entry by the undercover agent. She

---

[13] Where coercion or duress is alleged to have induced the commission of a crime, the proper "remedy" is the defense of entrapment. Under *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), this Court adopted an "objective" test for entrapment which considers whether reprehensible police conduct could have induced the commission of a crime by one not ready and willing to commit it. Whether entrapment occurred under the facts of this case should be considered on remand.

claims she had car trouble. She asked to enter to use the phone and was allowed in.

Therefore, this Court finds nothing which would constitute an unreasonable search in this case on this record.

## IV

### CONCLUSION

The entry of JoAnn Ward into Donald Catania's home without a warrant was not a "search" under either the Fourth Amendment of the United States Constitution or art 1, § 11 of the Michigan Constitution. Ms. Ward entered the home with Mr. Catania's permission, albeit for a hidden purpose. While in Catania's home, Ward did not exceed the scope of the invitation extended by Catania. There was no forcible entry effected or attempted[14] by exercise of governmental authority or power. Mr. Catania had no reasonable expectation of privacy to the extent he exposed his activities to Ms. Ward. Since no search occurred, no warrant was required, and no showing of cause was necessary. Therefore, the judgment of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for consideration of the remaining issues.

WILLIAMS, C.J., and RILEY, J., concurred with BOYLE, J.

BRICKLEY, J., concurred in the result only.

LEVIN, J. (*concurring*). Donald Catania was convicted of possession with intent to deliver cocaine[1]

---

[14] Cf. *Marshall v Barlow's, Inc,* 436 US 307; 98 S Ct 1816; 56 L Ed 2d 305 (1978) (search without a warrant invalid because reasonable expectation of privacy in business premises vis-à-vis government OSHA inspector maintained despite entry of employees into work area).

[1] MCL 333.7401(1), (2)(a)(iv); MSA 14.15(7401)(1), (2)(a)(iv).

and of possession with intent to deliver mari-juana,[2] as a second felony offender.[3]

The Court of Appeals reversed, stating that there had been a warrantless search of Catania's home and that he had not consented to the search. While I agree with that analysis of the Court of Appeals, I join in the reinstatement of Catania's conviction because the information that formed the basis for Catania's conviction was not obtained as a result of the search, but rather was imparted by Catania to the undercover agent as a result of misplaced confidence in her.

I

The Berrien County Metro Narcotics Squad di-rected JoAnn Ward, an eighteen-year old law en-forcement student, to knock on the door of Cata-nia's home. When Catania answered the door, Ward feigned that she was experiencing car trou-ble and asked to use the telephone. After she had made a bogus call, Ward and Catania sat at the kitchen table. Ward then initiated a discussion about "partying"; she told Catania that she was on her way to a party and told him the location of the party. Catania suggested to Ward that they smoke a "joint" of marijuana. Catania walked over to the kitchen counter where there was a tray with a plastic baggie containing suspected marijuana, a "roach clip," and some cigarette rolling papers. Catania proceeded to roll a cigarette of suspected marijuana which he and Ward then smoked.

After they had smoked the cigarette, Ward asked if she could obtain a couple of "joints" for the road. Catania told her that he didn't have enough. Ward then asked Catania if he knew

[2] MCL 333.7401(1), (2)(c); MSA 14.15(7401)(1), (2)(c).

[3] MCL 333.7413; MSA 14.15(7413).

whether there was any "coke" around. Catania replied, "What do you think you fell into here?" Ward and Catania discussed the possibility of meeting at a bar later that night. She spent approximately one-half hour in Catania's residence.

On the basis of the information that Ward had obtained, a police officer swore out an affidavit for a search warrant stating that Catania had given Ward a rolled marijuana cigarette, that Ward saw a quantity of marijuana from which Catania rolled the marijuana cigarette and suspected there was marijuana in his home. The return, following the execution of the search warrant issued on that affidavit, included a baggie of marijuana. One of the officers who executed that search warrant swore out an affidavit for a search warrant stating that he "saw in the bedroom in the place to be searched a bale of suspected marijuana weighing between 50 and 100 lbs, I also saw a set of scales, commonly used for weighing out marijuana, I also saw a plastic baggie containing a white powdery substance suspected to be cocaine; there also was what appeared to be ledger books and a quantity of paper U.S. currency." The return, following the execution of that search warrant, included one bale of marijuana and one plastic baggie containing cocaine.

II

I agree with the Court of Appeals that Donald Catania had a reasonable expectation of privacy in his home. I also agree that he did not consent to allowing a police agent to search his home when he admitted Ward on a ruse.

The decisions of the United States Supreme

Court on consensual searches are not in point.[4] In
the law of torts, consent to an intentional interfer-
ence with person or property is invalid if "the
consenting person was mistaken about the nature
and quality of the invasion intended by the con-
duct."[5] If a person were to give another a box of
candy knowing that it is poisoned, and that the
other person is unaware that it is poisoned, the
person providing the candy is subject to liability
because the other person did not consent to the
kind of invasion which the person providing the
candy intended.[6]

Judicial decisions elaborating on the common-
law elements of burglary indicate that the decep-
tive means used to obtain consent to enter Cata-

_____

[4] The Supreme Court first attempted to define what constitutes a
valid consent in *Bumper v North Carolina,* 391 US 543; 88 S Ct 1788;
20 L Ed 2d 797 (1968). The Court held ineffectual consent given to a
search after the official conducting the search had falsely asserted
that he possessed a search warrant. The Court found the prosecution
had failed to meet its burden of proving that the consent was "freely
and voluntarily given" and concluded that "[w]here there is coercion
there cannot be consent." *Id.,* pp 548-550.

In *Schneckloth v Bustamonte,* 412 US 218; 93 S Ct 2041; 36 L Ed 2d
854 (1973), the Court held that consent by one not in police custody
may be voluntary if there is not undue coercion, even though the
consenter was unaware of his right to refuse consent. The Court said:

> We hold only that when the subject of a search is not in
> custody and the State attempts to justify a search on the basis
> of his consent, the Fourth and Fourteenth Amendments require
> that it demonstrate that the consent was in fact voluntarily
> given, and not the result of duress or coercion, express or
> implied. Voluntariness is a question of fact to be determined
> from all the circumstances . . . . [*Id.,* pp 248, 249.]

The government thus had no affirmative obligation to inform a
potential consenter of his right to withhold consent. The discussion in
*Schneckloth* was limited to searches in which a uniformed govern-
ment official openly seeks consent to enter private premises. The
primary concern in *Schneckloth* was use of the cloak of authority to
coerce a person into consenting to a search.

[5] Prosser & Keeton, Torts (5th ed), § 18, p 114; 2 Restatement Torts,
2d, § 55, p 88.

[6] *Id.,* § 18, pp 119-120.

nia's house should render the consent invalid. At common law, the crime of burglary consisted of, among other elements, breaking and entering.[7] Entry gained by fraud was deemed to be a constructive breaking.[8] In *LeMott's Case* (1650), see commentary 84 Eng Rep 1073, 1074 (1650), thieves intending to rob a house found the door locked and pretended they went to the house to speak with the owner. A servant then opened the door and they entered and robbed the owner, "and this being in the night time, this was adjudged burglary, and the persons hanged; for their intention being to rob, and getting the door open by a false pretence this was *in fraudem legis,* and so they were guilty of burglary . . . ."[9] Similarly, in *Ann Hawkin's Case*,[10] a thief was indicted for burglary after she robbed a house which she had induced a boy to open by promising him a pot of ale. The court said that the thief obtained entry by fraud. Subsequent case law has extended this principle rather generally to cases in which entrance has been gained by means of some trick or artifice.[11]

Although Ward's activities did not constitute common-law burglary, because she did not intend to commit a felony, her entry into Catania's home was, because she gained entry by misrepresenting her purpose in seeking entry, a breaking at common law.

III

In *Lewis v United States,* 385 US 206; 87 S Ct 424; 17 L Ed 2d 312 (1966), reh den 386 US 939

---

[7] LaFave & Scott, Criminal Law, § 96, p 708.

[8] *Id.,* p 709.

[9] *Id.,* p 1073.

[10] 2 East, Pleas of the Crown 484, 485 (1704).

[11] Perkins, Criminal Law (3d ed), p 249; see also 4 Blackstone, Commentaries on the Laws of England, pp 224, 226-227 (1898).

(1967), a federal narcotics agent, by misrepresenting his identity and stating his willingness to purchase narcotics, was invited into defendant's home where on two occasions a narcotics sale was consummated, the agent during neither of his visits seeing, hearing, or taking anything not contemplated by the defendant as a necessary part of his illegal business. The narcotics were introduced in evidence, over defendant's objection, at his trial. The United States Supreme Court held that the Fourth Amendment was not violated and hence the narcotics were admissible in evidence:

> In the instant case, on the other hand, the petitioner invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics. Petitioner's only concern was whether the agent was a willing purchaser who could pay the agreed price. Indeed, in order to convince the agent that his patronage at petitioner's home was desired, petitioner told him that, if he became a regular customer there, he would in the future receive an extra bag of marihuana at no additional cost; and in fact petitioner did hand over an extra bag at a second sale which was consummated at the same place and in precisely the same manner. During neither of his visits to petitioner's home did the agent *see, hear, or take anything that was not contemplated,* and in fact *intended, by petitioner as a necessary part of his illegal business. . . .*
>
> The fact that the undercover agent entered petitioner's home does not compel a different conclusion. Without question, the home is accorded the full range of Fourth Amendment protections. See *Amos v United States,* 255 US 313 [41 S Ct 266; 65 L Ed 654] (1921); *Harris v United States,* 331 US 145, 151, n 15 [67 S Ct 1098; 91 L Ed 1399] (1947). But when, as here, the home is converted into a commercial center to *which outsiders are invited for purposes of transacting unlawful business,* that

business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. *A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.* Of course, this does not mean that, whenever entry is obtained by invitation and the locus is characterized as a place of business, an agent is authorized to conduct a general search for incriminating materials . . . . [*Id.*, at 210-211.]

Here, as in *Lewis*, Ward did not "see, hear, or take anything that was not contemplated." Catania offered Ward a marijuana cigarette. A search warrant was obtained on that basis permitting a search only for marijuana. On the basis of what was discovered in executing that search warrant, another search warrant was obtained and the cocaine evidence was obtained. In offering Ward a joint of marijuana, Catania chose to make Ward aware of his possession of marijuana; it cannot be said that Ward's seeing, hearing about, and taking with her from Catania's home information of his possession of marijuana "was not contemplated."

If Catania had not offered Ward a marijuana cigarette, and she had rather observed marijuana in "plain view," I would agree with the Court of Appeals that the evidence was obtained as a result of a warrantless search and should be suppressed. The evidence here was rather obtained as a result of misplaced confidence in Ward.[12]

I agree with the majority that Ward's enticement of Catania should be analyzed in terms of the defense of entrapment and not in terms of search and seizure law.

ARCHER, J. (*dissenting*). The underlying facts of

[12] Cf. *Hoffa v United States*, 385 US 293; 87 S Ct 408; 17 L Ed 2d 374 (1966).

this case are set forth in detail in *People v Catania*, 140 Mich App 755; 366 NW2d 38 (1985). The pertinent facts may be briefly stated.

Defendant was convicted by a jury of possession of cocaine with intent to deliver, MCL 333.7401(1), (2)(a)(iv); MSA 14.15(7401)(1), (2)(a)(iv), and possession of marijuana with intent to deliver, MCL 333.7401(1), (2)(c); MSA 14.15(7401)(1), (2)(c). Defendant received a concurrent sentence of eight to forty years for the possession of cocaine offense and five to eight years for the possession of marijuana offense.

Leave to appeal was granted in this case to determine whether defendant's consent to entry to his house by a police informant was rendered invalid where the consent was obtained by deceptions as to the informant's identity and purpose.

We would hold that an entry without a warrant effected by ruse constitutes an unreasonable and illegal search under Const 1963, art 1, § 11, when there was no rational basis to suspect that criminal activity was afoot in defendant's home at the time the entry took place. The record in this case is devoid of any evidence concerning why the governmental authorities selected defendant's home to conduct such an entry. We would therefore remand this case to the trial court for an evidentiary hearing.

### I. FACTS

On March 10, 1981, JoAnn Ward, described as a very attractive eighteen-year-old, was a confidential police informant for the Berrien County Metro Narcotics Squad. Ms. Ward was also the sister-in-law of one of the narcotic squad detectives assigned to defendant's case. On the evening of March 10, Ms. Ward was directed to go to a

residence located at 2106 Russell Road for the *sole purpose of inducing the occupant to sell her some drugs.* Upon arrival at the site, Ms. Ward knocked on the back door and defendant answered. Ms. Ward feigned car trouble and sought entry into defendant's home to use his telephone. She did not identify herself as a police agent. Defendant admitted Ms. Ward and directed her to the phone. After making a bogus phone call, Ms. Ward engaged in conversation with defendant and presented herself as a "party girl." She did not bring up the subject of drugs, however, defendant invited Ward to smoke a "joint" with him. Ms. Ward and defendant then smoked a joint which was provided by defendant. Ms. Ward then asked defendant if he knew where she could obtain some "coke," defendant responded: "What do you think you fell into here?"

Ms. Ward left defendant's home and reported her findings to the authorities. On the basis of the information obtained from Ms. Ward, an affidavit was sworn out, and a search warrant issued. The search warrant authorized the police to search defendant's residence for a "quantity of . . . marijuana." During the search, officers discovered a garbage bag containing what was later identified as marijuana. A plastic bag containing a white powdery substance later identified as cocaine, a large amount of currency, and triple beam scales were also discovered. Defendant was placed under arrest for possession of marijuana. A second search warrant was issued for the cocaine and 19.2 grams of cocaine were seized.

## II. ANALYSIS

Relying on the United States Supreme Court holdings in *Katz v United States,* 389 US 347; 88 S

Ct 507; 19 L Ed 2d 576 (1967), and *Hoffa v United States,* 385 US 293; 87 S Ct 408; 17 L Ed 2d 374 (1966), the majority concludes that there has been no violation of the Michigan or United States Constitution in this case. In reaching this conclusion, the majority overlooks the fact that the record is devoid of any evidence concerning the basis upon which the authorities selected defendant's home to conduct the initial ruse entry without a warrant.

In *Berger v New York,* 388 US 41, 53; 87 S Ct 1873; 18 L Ed 2d 1040 (1967), the United States Supreme Court held:

> "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." *Wolf v Colorado,* 338 US 25, 27 [69 S Ct 1359; 93 L Ed 1782] (1949). And its "fundamental protections . . . are guaranteed . . . against invasion by the States." *Standard v Texas,* 379 US 476, 481 [85 S Ct 506; 13 L Ed 2d 431] (1965). . . . "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." At 528.

The home is afforded the full range of Fourth Amendment protection. *Lewis v United States,* 385 US 206, 208; 87 S Ct 424; 17 L Ed 2d 312 (1966), citing *Amos v United States,* 255 US 313; 41 S Ct 266; 65 L Ed 654 (1921) (Bottles of whiskey testified about by government's witnesses, revenue agents, were seized by the agents within the curtilage of defendant's house and store, during his absence. Because the agents did not obtain a search warrant prior to conducting the search of defendant's home, the Court held that defendant's

Fourth and Fifth Amendment rights had been violated. Defendant's wife permitted the agents to enter the home. The evidence which was seized was returned to the defendant.).

On the basis of the holding in *Berger,* we would hold that before a ruse entry into one's home without a warrant can withstand a Fourth Amendment challenge, there must be a showing that there was a rational basis to suspect that criminal activity was afoot at the home. Entries without warrants effected by ruse which are not based on objective and articulable facts concerning suspected criminal activity, constitute arbitrary intrusions which cannot be tolerated under the Fourth Amendment or Const 1963, art 1, § 11.

In a case with facts similar to the facts presented here, *State v Ahart,* 324 NW2d 317 (Iowa, 1982), the Iowa Supreme Court was asked to determine whether the ruse entry without a warrant by a law enforcement officer violated any of defendant's Fourth Amendment or state constitutional rights. The facts presented in the *Ahart* case were as follows. Two law enforcement officers drove a car to defendant's home and feigned car trouble. One of the two officers knocked on defendant's door and told the person who opened the door that his car had broken down and that he needed to call his boss. The officer was admitted and pretended to make a credit card phone call to someone. While making the phone call, the officer observed marijuana and drug paraphernalia in plain view. The officer then left the defendant's home and drove away from the area. Several days later a search warrant was issued and a subsequent search of defendant's home took place. Marijuana was discovered and seized during the search. In response to defendant's constitutional challenge

to the entry by ruse without a warrant, the Iowa Supreme Court stated:

> While we recognize that a warrantless entry effected by ruse must often be allowed if the government is to ferret out "those organized criminal activities that are characterized by covert dealings," *Lewis,* 385 US at 210-11; 87 S Ct at 427; 17 L Ed 2d at 316, we are equally cognizant that the security of one's home against arbitrary intrusion by the police is at the core of the fourth amendment and basic to our society. *Berger v New York,* 388 US 41; 87 S Ct 1873; 18 L Ed 2d 1040; 68 Am Jur 2d, Search[es] and Seizure[s], § 2 (1973) . . . . Consequently, not all warrantless entries gained by ruse are valid. Certainly, such an entry is not allowable if it is arbitrary. [324 NW2d 319.]

Because the court could not determine whether, at the time the police sought entry into defendant's home, they had reason to believe that criminal activity was afoot in the Ahart home, the entry without a warrant was found to violate both the United States Constitution and the Iowa Constitution. See also *Guidry v State,* 671 P2d 1277 (Alas, 1983) (where the Alaska Supreme Court used a rational basis to suspect criminal activity is afoot standard as part of its reason for upholding the challenged ruse entry without a warrant under the Alaska Constitution).

In the instant case, Ms. Ward gained entry into defendant's home by ruse. Defendant consented to Ward's entry on the basis of a deception as to her identity and purpose. The police directed Ms. Ward to attempt entry by ruse into defendant's home for the sole purpose of gathering evidence concerning defendant's involvement in narcotics trafficking. The record is devoid, however, of any

evidence suggesting reasons why defendant was targeted by the police for such an investigation.

During trial the prosecution attempted to question the Deputy Sheriff of the Berrien County Sheriff's Department, Steven Marschke, concerning the reason why Ms. Ward was sent to defendant's home. For reasons which are unclear to this Court, the trial court would not allow the admission of this evidence into the record. An affidavit was prepared by Officer Marschke which details facts concerning defendant's involvement in narcotics trafficking. This affidavit, however, is dated March 8, 1985, which is after the Court of Appeals opinion in this case was published.[1] The affidavit therefore cannot properly be considered by this Court.

We recognize "the necessity for some undercover police activity" and that "in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." *Lewis, supra* at 208-209. However, before the authorities can validly carry out an entry without a warrant effected by ruse under the United States Constitution or the Michigan Constitution, there must be a showing that there was a rational basis to believe that criminal activity was afoot at the defendant's home. The reasons given by the authorities to support their belief that criminal activity has taken place in the past or is presently taking place must be based on objective and articulable facts.

## CONCLUSION

Ruse entries without warrants which are not based on a reasonable suspicion that criminal

---

[1] The Court of Appeals opinion was released February 19, 1985.

activity has taken or is taking place constitute arbitrary intrusions into one's privacy. Arbitrary intrusions into a person's privacy are not allowable under the Fourth Amendment or art 1, § 11, and will not validate subsequent searches without warrants.

We would reverse and remand this case to the circuit court for further proceedings in accordance with this opinion.

CAVANAGH, J., concurred with ARCHER, J.