**Lansing, Michigan**

# Opinion

Chief Justice:       Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                     Marilyn Kelly
                     Stephen J. Markman
                     Diane M. Hathaway
                     Mary Beth Kelly
                     Brian K. Zahra

FILED JULY 1, 2011

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v                               No. 141009

MARK SLAUGHTER,

        Defendant-Appellee.

BEFORE THE ENTIRE BENCH

YOUNG, C.J.

    In this case, we are called upon to determine whether the community caretaking exception to the Fourth Amendment's requirement that a warrant be obtained before a residence can be entered applies to a first-response firefighter answering a 911 call and, if so, whether the firefighter's entry into defendant's residence was reasonable in the instant case. We conclude that the community caretaking exception applies to firefighters no less than to police officers when they are responding to emergency situations that threaten life or property. We also conclude that the firefighter's actions in this case were reasonable, thus satisfying the community caretaking exception to the warrant

requirement. Accordingly, we reverse the decision of the circuit court and the Court of Appeals' judgment and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

Defendant, Mark Slaughter, resided in a townhouse in Royal Oak, Michigan.[1] In May 2007, defendant's neighbor, Kathleen Tunner, saw water running down her basement wall and over her electrical box. She also heard water flowing behind that wall, which adjoined defendant's townhouse.[2] Tunner attempted to locate defendant by knocking on his door, but he was not home. She then called her townhouse management company in a further attempt to locate defendant. After this attempt failed, Tunner dialed 911. The city of Royal Oak dispatched several firefighters to the townhouse, including Lieutenant Michael Schunck. After consulting with Tunner about her emergency call, Schunck entered defendant's residence. When he went to the basement to shut off defendant's water and to assess whether any additional measures needed to be taken to prevent a fire, Schunck observed, in plain view, grow lights and several dozen plants that appeared to be marijuana. He then reported what he saw to the Royal Oak police.

---

[1] Although one of the issues at defendant's preliminary examination concerned whether defendant actually resided at the Royal Oak townhouse, defendant admitted during his testimony at the suppression hearing that he had lived at the townhouse for "a year or two" before his arrest.

[2] Defendant's and Tunner's townhouses are adjoining units in a single structure containing approximately 12 individual units.

The Royal Oak Police Department dispatched an officer to secure defendant's townhouse while another officer procured a search warrant. After entering defendant's townhouse, officers seized 48 marijuana plants, grow lights, a watering system, defendant's state identification card, books on marijuana horticulture, packaging material, and other drug paraphernalia.

Defendant was charged with manufacturing with the intent to deliver more than 20 but fewer than 200 marijuana plants.[3] The district court bound defendant over as charged, notwithstanding defendant's claims that the firefighter's entry into the townhouse violated his Fourth Amendment rights and that he did not exercise dominion and control over the seized marijuana plants.

Although defendant did not appeal the bindover decision, he subsequently filed a pretrial motion to suppress in the circuit court. After hearing testimony and oral argument, the court granted the motion in a written opinion and order. The circuit court concluded that Lieutenant Schunck "did not attempt to hear or see for himself what was causing the problem [that led Tunner to dial 911], nor did he attempt to verify the existence of running water in the wall prior to entering the defendant's home." The circuit court also observed that Schunck had indicated that "he would have entered the apartment even if he had shut off the water and/or electrical from the outside" because "he has to investigate the [911] calls to the fullest extent possible . . . ."

---

[3] MCL 333.7401(2)(d)(*ii*).

The circuit court applied this Court's decision in *People v Tyler*[4] and the United States Supreme Court's decision in *Camara v Muni Court of City & Co of San Francisco*[5] in concluding that firefighters are required to procure a warrant before entering a building "to prevent a fire from occurring . . . ." Furthermore, it relied on the fact that this Court's decision in *People v Davis*,[6] which articulated the community caretaking exception to the Fourth Amendment's warrant requirement, did not contain "anything related to the investigation of a possible fire hazard." Accordingly, the court ruled that the firefighters could not avail themselves of the community caretaking exception.

The Court of Appeals affirmed the circuit court's ruling in a split, unpublished decision, albeit on alternative grounds.[7] First, the majority determined, contrary to the circuit court's decision, that the community caretaking exception can apply to searches performed by first-response firefighters to abate a possible fire hazard. However, the majority explained that "the record permits the conclusion that the firefighters were simply too quick to enter into defendant's unit and failed to investigate the complaint" before entering defendant's residence.[8] Thus, the majority concluded that "there are too

---

[4] *People v Tyler*, 399 Mich 564; 250 NW2d 467 (1977), aff'd sub nom *Michigan v Tyler*, 436 US 499 (1978).

[5] *Camara v Muni Court of City & Co of San Francisco*, 387 US 523; 87 S Ct 1727; 18 L Ed 2d 930 (1967).

[6] *People v Davis*, 442 Mich 1; 497 NW2d 910 (1993).

[7] *People v Slaughter*, unpublished opinion per curiam of the Court of Appeals, issued March 16, 2010 (Docket No. 287459).

[8] *Id.* at 5.

many outstanding questions to conclude whether the firefighters acted reasonably" and, therefore, that the circuit court had properly granted the motion to suppress.[9]

The dissenting judge agreed with the majority that first-response firefighters can avail themselves of the community caretaking exception to the Fourth Amendment's warrant requirement. The dissenting judge, however, concluded that the firefighters had acted reasonably in the instant case, indicating that "[t]he firefighters were faced with a possible emergency situation and they needed to make quick judgments about what to do in order to avoid a potential fire."[10]

This Court granted the prosecutor's application for leave to appeal and ordered the parties to brief whether

> (1) the actions of firefighters may fall under the "community caretaker" exception to probable cause requirements; (2) the "emergency aid" aspect of the community caretaker exception applies in this case; and (3) the Court of Appeals erred when it held that the firefighters were first obligated to attempt to remedy the condition for which a neighbor called by using means that did not involve entry into the defendant's home.[11]

## II. STANDARD OF REVIEW

A court's factual findings at a suppression hearing are reviewed for clear error, but the application of the underlying law—the Fourth Amendment of the United States Constitution and article 1, § 11 of the Michigan Constitution—is reviewed de novo.[12]

---

[9] *Id.* at 6.

[10] *Id.* at 2-3 (METER, J., dissenting).

[11] *People v Slaughter*, 486 Mich 1069 (2010).

[12] *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005).

## III. ANALYSIS

## A. FOURTH AMENDMENT PRINCIPLES

The Fourth Amendment of the United States Constitution guarantees every person's right to be free from unreasonable searches and seizures and provides, in its entirety:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[13]

Similarly, article 1, § 11 of the Michigan Constitution provides, in relevant part:

> The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation.

This Court has ruled that the Michigan Constitution "is to be construed to provide the same protection as that secured by the Fourth Amendment, absent 'compelling reason' to impose a different interpretation."[14]

Although the entry into defendant's residence was warrantless, "[u]nder the common law and agreeably to the Constitution search may in many cases be legally made

---

[13] The Fourth Amendment was incorporated to the states in *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

[14] *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991), citing *People v Perlos*, 436 Mich 305; 462 NW2d 310 (1990), *People v Chapman*, 425 Mich 245; 387 NW2d 835 (1986), *People v Catania*, 427 Mich 447; 398 NW2d 343 (1986), *People v Smith*, 420 Mich 1, 23 n 16; 360 NW2d 841 (1984), and *People v Nash*, 418 Mich 196; 341 NW2d 439 (1983).

6

without a warrant. The Constitution does not forbid search, as some parties contend, but it does forbid unreasonable search."[15] While many warrantless searches are unreasonable pursuant to the warrant requirement,[16] the United States Supreme Court has articulated several instances in which warrantless searches are reasonable. These include searches of automobiles,[17] searches incident to contemporaneous lawful arrests,[18] inventory searches conducted according to established procedure,[19] searches conducted during exigent circumstances,[20] and searches the police undertake as part of their "community caretaking" function.[21]

The instant case involves only the last circumstance listed—searches undertaken as part of a community caretaking function—and requires this Court to determine the scope of that community caretaking exception to the Fourth Amendment's warrant requirement. Because it is uncontested that the initial search of defendant's residence

---

[15] *Carroll v United States*, 267 US 132, 146; 45 S Ct 280; 69 L Ed 543 (1925).

[16] See *Katz v United States*, 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967).

[17] See *California v Carney*, 471 US 386; 105 S Ct 2066; 85 L Ed 2d 406 (1985).

[18] See *Chimel v California*, 395 US 752; 89 S Ct 2034; 23 L Ed 2d 685 (1969); *Maryland v Buie*, 494 US 325; 110 S Ct 1093; 108 L Ed 2d 276 (1990).

[19] See *South Dakota v Opperman*, 428 US 364; 96 S Ct 3092; 49 L Ed 2d 1000 (1976).

[20] See *Minnesota v Olson*, 495 US 91; 110 S Ct 1684; 109 L Ed 2d 85 (1990). The exigent circumstances exception to the warrant requirement is inapplicable to this case. "When the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime." *Davis*, 442 Mich at 24.

[21] See *Cady v Dombrowski*, 413 US 433; 93 S Ct 2523; 37 L Ed 2d 706 (1973).

was warrantless, we must determine whether the community caretaking exception to the warrant requirement applies.

## B.  THE COMMUNITY CARETAKING EXCEPTION

The United States Supreme Court first recognized the community caretaking exception to the warrant requirement in *Cady v Dombrowski*, which involved the constitutionality of the search of the trunk of an out-of-town police officer's automobile.[22]  The police officer was hospitalized after a serious automobile accident, and local police officers arriving on the scene of the accident directed that the injured officer's vehicle be towed to a private garage.  Because the private garage was unsecured, local police sought to locate and safeguard the injured officer's service revolver.  After failing to find the revolver on the officer's person or in the glove compartment of the vehicle, officers searched the vehicle's trunk and discovered the revolver, along with evidence of a murder.[23]

Before addressing the legality of the search, the Court explained that police officers often perform certain duties independent of their duty to investigate crimes:

> Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.[24]

---

[22] *Id*. at 435-437.

[23] *Id*.

[24] *Id.* at 441.

8

In considering the case before it, the *Cady* Court determined that the officers had acted not to investigate a crime, but out of "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle."[25] The Court concluded that searches conducted to further these community caretaking functions do not necessarily require a warrant in order to be reasonable. Once it had determined that the search was not conducted pursuant to an investigation, the Court analyzed the reasonableness of the search *within the scope of the officers' community caretaking functions*: the officers "were simply reacting to the effect of an accident—one of the recurring practical situations that results from the operation of motor vehicles and with which local police officers must deal every day."[26] In the end, the Court held that the warrantless search was a reasonable exercise of the officers' community caretaking functions and concluded that their search of the vehicle did not violate the Fourth Amendment:

> Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not "unreasonable" within the meaning of the Fourth and Fourteenth Amendments.[27]

This Court has recognized the community caretaking exception as applicable under Michigan law. In *People v Davis*, we explained:

---

[25] *Id.* at 447.

[26] *Id.* at 446.

[27] *Id.* at 448.

The police perform a variety of functions that are separate from their duties to investigate and solve crimes. These duties are sometimes categorized under the heading of "community caretaking" or "police caretaking" functions. When police, while performing one of these functions, enter into a protected area and discover evidence of a crime, this evidence is often admissible. . . .

\* \* \*

[A]ccording to the United States Supreme Court, the defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police.

\* \* \*

Federal and state courts have included a variety of police activities under the heading of community caretaking functions. Courts have held that impoundment of automobiles and inventory searches of them, as in *Cady*, responding to missing vehicle complaints, investigating noise complaints, and searching an unconscious person for identification are community caretaking functions.[28]

---

[28] *Davis*, 442 Mich at 20-23. Part of an officer's community caretaking function is the rendering of emergency aid to injured persons. This Court has concluded that, in entering a dwelling to render emergency aid to a person inside, "[an] officer must be motivated primarily by the 'perceived need to render aid or assistance'" and "may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance." *City of Troy v Ohlinger*, 438 Mich 477, 484; 475 NW2d 54 (1991), quoting *State v Prober*, 98 Wis 2d 345, 365; 297 NW2d 1 (1980). This Court has further required entering officers to "possess specific and articulable facts that lead them to" the conclusion that someone inside "is in need of immediate aid." *Davis*, 442 Mich at 25-26. Proof of someone's needing assistance need not be "ironclad," only "reasonable." *Michigan v Fisher*, 558 US ___, ___; 130 S Ct 546, 549; 175 L Ed 2d 410, 414 (2009). While there is no evidence that the firefighters who entered defendant's residence possessed specific and articulable facts that led them to the conclusion that *someone inside* was in need of immediate aid, these principles are instructive in determining whether they believed imminent action was necessary to prevent a threat that placed persons and property in danger.

10

*Davis* further explained that, because "[c]ommunity caretaking activities are varied and are performed for different reasons,"[29] not all conduct that falls within the police's community caretaking functions can be judged equally. Indeed, shortly after issuing the *Davis* decision, this Court listed several additional types of intrusions that courts have justified pursuant to the exercise of community caretaking functions:

> [C]ourts have included a multiplicity of police functions within the meaning of the community caretaking function, including entering an apartment to remove a former girlfriend following a domestic dispute, removing an intoxicated person from the street, entering an abandoned boat to ascertain ownership and the safety of the mariners, responding to a missing vehicle complaint, searching an unconscious person for identification, and responding to persons likely to be in need of emergency aid.[30]

Accordingly, courts must consider the reasons that officers are undertaking their community caretaking functions, as well as "the level[] of intrusion the police make while performing these functions," when determining whether a particular intrusion to perform a community caretaking function is reasonable.[31] For instance, "a police

---

[29] *Davis*, 442 Mich at 25.

[30] *In re Forfeiture of $176,598*, 443 Mich 261, 273-274; 505 NW2d 201 (1993) (citations omitted). In that case, this Court "decline[d] to employ the community caretaking exception" because "[b]oth of the officers who entered the home testified that the purposes of the entry were to search for intruders and to secure the premises in an effort to thwart an attempted escape," not to undertake any of the listed community caretaking functions. *Id.* at 274-275. The case's discussion of community caretaking functions, while dicta, nevertheless illustrates that, contrary to the dissent's suggestion that the community caretaking exception applies on its face to only a narrow and undefined subcategory of cases involving police community caretaking functions, this Court has considered several different—and unrelated—community caretaking *functions* when determining whether a warrantless search is reasonable.

[31] *Davis*, 442 Mich at 25.

inventory of a car is much less intrusive than a police entry into a dwelling."[32]  This is because the privacy of the home stands "'[a]t the very core'"[33] of the Fourth Amendment and because "[i]n [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . ."[34]  Thus, the threshold of reasonableness is at its apex when police enter a dwelling pursuant to their community caretaking functions.

## C.  FIREFIGHTERS AND THE COMMUNITY CARETAKING EXCEPTION

This Court asked the parties to brief whether the community caretaking exception to the warrant requirement applies to firefighters' actions.  We conclude that the community caretaking exception to the warrant requirement applies when a firefighter, responding to an emergency call involving a threat to life or property, reasonably enters a private residence in order to abate what is reasonably believed to be an imminent threat of fire inside.  Therefore, once it is determined that a firefighter's entry into a private residence was an exercise of community caretaking functions, and not an exercise of investigative functions, we must consider the reasonableness of the entry within the context of that community caretaking purpose.

United States Supreme Court caselaw specifically pertaining to firefighters supports this conclusion.  In *Michigan v Tyler*, the Court concluded that "the Fourth

---

[32] *Id.*

[33] *Payton v New York*, 445 US 573, 589-590; 100 S Ct 1371; 63 L Ed 2d 639 (1980), quoting *Silverman v United States*, 365 US 505, 511; 81 S Ct 679; 5 L Ed 2d 734 (1961).

[34] *Payton*, 445 US at 589.

Amendment extends beyond the paradigmatic entry into a private dwelling by a law enforcement officer in search of the fruits or instrumentalities of crime."[35] Indeed, "there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman . . . ."[36]

The principle most relevant to this case from those decisions applying the Fourth Amendment's warrant requirement to firefighters is that the Fourth Amendment applies equally to police officers and firefighters. It thus follows that if a police officer can avail himself of an exception to the warrant requirement, a firefighter can likewise avail himself of an exception if the circumstances permit. Indeed, *Tyler* is premised on just that principle: that the exceptions to the warrant requirement apply no less to firefighters than to police officers who have responded to 911 calls requiring imminent action to prevent harm to persons or property.

Like decisions applying the community caretaking exception to police officers' actions, *Tyler* distinguished a firefighter's community caretaking functions from his investigative functions.[37] As a general rule, "official entries to investigate the cause of a

---

[35] *Michigan v Tyler*, 436 US 449, 504; 98 S Ct 1942; 56 L Ed 2d 486 (1978).

[36] *Id.* at 506; see also *Camara*, 387 US at 530 ("It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.").

[37] Similarly, Michigan statutory law recognizes the same emergency/investigation distinction, providing firefighters in uniform and under supervision the authority to "take all necessary steps and requirements to protect persons and property until [a] dangerous condition is abated," MCL 29.7a(2), as well as the *separate* authority to "investigate causes and effects related to dangerous conditions," MCL 29.7a(3).

fire must adhere to the warrant procedures of the Fourth Amendment."[38]  Nevertheless, "it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze.  And once in a building for this purpose, firefighters may seize evidence of arson that is in plain view."[39]  In short, under *Tyler*, the purpose of a firefighter's *initial* entry into a building is crucial in determining whether a warrant is required for that entry.

The *Tyler* Court's application of the Fourth Amendment to firefighters fits directly into the purposes of the community caretaking exception.  Thus, as *Cady* and *Tyler* illustrate, we must analyze the reasonableness of the initial intrusion in light of the scope of the intrusion and the firefighter's purpose in entering the residence.  If the purpose of a firefighter's initial entry into a private residence is to abate an imminent threat of fire, then a warrantless entry is lawful under the Fourth Amendment as long as it is reasonable.  Contrarily, if the purpose of a firefighter's entry is solely to investigate a crime, then a warrant is required unless a different exception to the warrant requirement applies.  *Tyler*'s holding and rationale lead inexorably to the conclusion that the community caretaking exception applies to firefighters.  Therefore, we hold that the community caretaking exception applies to firefighters.[40]

---

[38] *Tyler*, 436 US at 508.

[39] *Id.* at 509.

[40] Our decision here is expressly limited to the question whether the community caretaking exception applies to firefighters.  We leave to another day the determination whether that exception may extend to other emergency first responders.

Application of the community caretaking exception does not provide firefighters with a blank check to enter private residences; rather, it only authorizes *reasonable* intrusions. Because "[c]ommunity caretaking functions are varied and are performed for different reasons,"[41] reviewing courts must tailor their analysis to the specifics of a particular intrusion before determining whether it is reasonable. Although neither Michigan caselaw nor that of the United States Supreme Court has specifically analyzed what factors affect whether a firefighter's intrusion into a private residence is reasonable, there is ample authority within the caselaw applying specific factors in related circumstances that allows this Court to articulate the standards that both protect individuals' Fourth Amendment rights and allow firefighters to perform their duty to abate serious fire hazards.

As stated, the privacy of the home stands at the very core of the Fourth Amendment's protections, and the zone of privacy is most clearly defined "when bounded by the unambiguous physical dimensions of an individual's home."[42] In determining whether firefighters acted reasonably in entering an individual's home, a reviewing court must first consider the firefighters' basis for making the intrusion— namely, whether, acting in good faith,[43] they "possess[ed] specific and articulable facts"

---

[41] *Davis*, 442 Mich at 25.

[42] *Payton*, 445 US at 589-590.

[43] See, e.g., *Colorado v Bertine*, 479 US 367, 374; 107 S Ct 738; 93 L Ed 2d 739 (1987) ("[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.").

leading them to the conclusion that their actions were necessary to abate an imminent threat of fire inside the private residence.[44] Their belief in the necessity of their intrusion need not be "ironclad," only "reasonable."[45] Furthermore, courts must not engage in a "hindsight determination" that an entry is unreasonable simply because no imminent hazard *actually* existed.[46] Rather, courts must determine whether an entry was reasonable on the basis of the circumstances known to the firefighters at the time of entry.[47]

Next, courts should consider the scope of the entry, which "must be limited to the justification therefor" and may not extend beyond what "is reasonably necessary to determine" whether the imminent threat of fire exists inside the private residence.[48] If firefighters do, in fact, find such a threat inside the residence, they may "remain in [the] building for a reasonable time" to abate the hazard and to "investigate [its] cause,"

---

[44] *Davis*, 442 Mich at 25.

[45] *Fisher*, 558 US at ___; 130 S Ct at 549; 175 L Ed 2d at 414.

[46] *Id.*

[47] See *id.* This standard is consistent with the United States Supreme Court's application of the warrant requirement to administrative searches in *Camara*. The search conducted in *Camara* was one to administer "fire, health, and housing code inspection programs . . . ." *Camara*, 387 US at 533. While the administration of fire, health, and housing code inspection programs is important to public safety, the application of the warrant requirement to the "routine systematized inspection" involved in *Camara* turned in part on the fact that "[i]t has nowhere been urged that fire, health, and housing code inspection programs could not achieve their goals within the confines of a reasonable search warrant requirement." *Id*. As stated, the application of the community caretaking exception in this case is limited to situations in which firefighters reasonably believe that their entry is necessary to abate an immediate threat to persons or property.

[48] See *Davis*, 442 Mich at 26.

because investigating the cause of the hazard "may be necessary to prevent its recurrence."[49]

Finally, in determining whether a particular entry is reasonably necessary, firefighters are not constrained to follow the least intrusive means of abating the imminent threat of fire. Indeed, that firefighters could have abated the fire hazard "by 'less intrusive' means does not, by itself, render the search unreasonable."[50] Rather, reviewing courts must consider whether the means and scope of entry were themselves reasonable under the totality of circumstances, not whether they were perfect.

## D. APPLICATION

Because the community caretaking exception is not a blank check for warrantless entry by firefighters, we apply the foregoing analysis to determine whether the firefighters' entry into defendant's residence was reasonable.

As stated, we must first analyze the firefighters' basis for entering defendant's private residence. The circuit court's findings of fact are relevant here and are not clearly erroneous:

> [Lieutenant Schunck] was called to [defendant's townhouse], in the City of Royal Oak. The call was based upon a report of a possible electrical problem with running water. Upon arrival, he spoke to a neighbor [Tunner], who indicated she suspected water was running between a common wall, which shares an electrical panel. [Schunck] attempted to

---

[49] *Tyler*, 436 US at 510. Investigating a fire can reveal "continuing dangers such as faulty wiring or a defective furnace." *Id.* Accordingly, the Court determined that "officials need no warrant to *remain* in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." *Id.* (emphasis added).

[50] *Cady*, 413 US at 447.

make contact with the owner of the neighboring apartment, but was unsuccessful. If there was water running onto an electrical box, it presented a life hazard and structure fire situation. [Schunck] made entry into the defendant's home to see if there was water running into the electrical box. . . . [Schunck] went into the apartment to check for running water, and shut off the electricity. It was possible . . . to shut off the water to the entire complex from outside, but the general practice is to shut off the individual apartment.

Upon cross-examination, [Schunck] indicated he did not see or hear any water before or after entering the apartment. In fact, he admitted he did not find any running water in the apartment. [Schunck] also admitted he did not shut off the water of the neighbor, nor did he check that apartment for water or dampness. He also admitted he did not turn off the electrical box for either apartment. [Schunck] was not sure where the meter [was] which would have permitted him to shut off the electricity without entering the apartment.

Upon re-direct examination, [Schunck] indicated he was not sure if he entered [Tunner's] apartment. He also indicated he would have entered [defendant's] apartment even if he had shut off the water and/or electrical from the outside. He testified he has to investigate the calls to the fullest extent possible . . . .

At no point did the circuit court indicate that it disbelieved Schunck's testimony. Schunck also testified that he shut off the water to defendant's townhouse and that he did so from the basement of defendant's townhouse.

It is clear from Schunck's testimony that he acted in good faith. There is no indication that his entry into defendant's residence was pretextual, and only upon entering defendant's basement to shut off the water to defendant's residence did Schunck see what appeared to be contraband in plain view.

Of course, good faith alone is not sufficient to satisfy the requirements of the Fourth Amendment; firefighters must "possess specific and articulable facts" leading them to the conclusion that their imminent action is necessary to abate the threat to

18

persons or property inside the private residence.[51]  In this case, Schunck knew of the 911

call and the information it contained.  Moreover, he spoke with Tunner, who reported that

she saw water coming into her basement from the wall that she shared with defendant and

that she heard water flowing behind that wall.[52]  Schunck had no reason to disbelieve

Tunner's assertion, although there was no evidence that he corroborated Tunner's

statement by witnessing or hearing the water himself.  Nevertheless, Tunner's report of

water leakage next to her electrical box was specific and articulable evidence supporting

Schunck's conclusion that his imminent action was necessary to abate a condition inside

defendant's residence that he reasonably believed was a threat to persons or property.

Furthermore, the fact that the townhouse complex contained several units attached

to each other elevated the imminence of the potential hazard.  Schunck explained that the

attached units were "real close together" and that they "share[d] electrical panels in the

basement at the bottom of these [common] walls."  Moreover, because a "high density"

of people lived in "all [the] connected apartments," Schunck explained that "a definite

life hazard and possible structur[al] fire type situation" existed.  These facts further

supported Schunck's decision to enter defendant's residence.

We conclude that, in assessing whether an entry was reasonable, courts must also

determine whether the scope of the entry was "limited to the justification therefor" or

whether it extended beyond what was "reasonably necessary" to abate the hazard inside

---

[51] *Davis*, 442 Mich at 25.

[52] Contrary to the dissent's assertion, the fact that Tunner did not immediately call 911, but instead sought to reach defendant, does not negate *Schunck's* belief in the imminence of the threat of electrical fire, nor does it make that belief objectively unreasonable.

19

the private residence.[53] In this case, Schunck entered defendant's townhouse by having one of his crew enter the townhouse through a window in order to let him enter through the front door. Moreover, Schunck shut off the water to defendant's townhouse from the basement, which was where Tunner believed the water was flowing and where Schunck found, in plain view, the plants he believed to be contraband.[54] Therefore, the extent of Schunck's entry and search of defendant's residence was limited to the area of the residence that the available information indicated was the location of the hazard.

The Court of Appeals panel determined that Schunck entered without considering alternative, less intrusive means of abating the hazard. This kind of post hoc analysis is inconsistent with the principles for assessing the reasonableness of entry that we announce today.

Although it was possible for Schunck to turn off the water from outside defendant's residence, several facts led Schunck to the conclusion that actual entry into defendant's residence was necessary. First, because defendant's residence was physically attached to several other units, Schunck sought to minimize disruption to defendant's neighbors. Schunck believed that turning off defendant's water from outside the unit

---

[53] *Id*. at 26.

[54] There is no indication that the marijuana plants were hidden from plain view in the basement of defendant's residence. Accordingly, if Schunck's entry into defendant's basement was lawful, then the plain view exception to the warrant requirement allowed this evidence to provide probable cause for the subsequent search warrant, pursuant to which were seized the marijuana plants along with other related evidence found elsewhere in defendant's residence. See *Arizona v Hicks*, 480 US 321; 107 S Ct 1149; 94 L Ed 2d 347 (1987).

would have shut off the water to the entire complex. Generally, he testified, the fire department "isolate[s] the individual problem in the apartment and shut[s] [the water] off from the inside." Second, even if he had turned off the water to defendant's residence from the outside, Schunck testified that "[t]here's no question" he would have still entered the residence because, as an agent of the city of Royal Oak, he needed to be sure the situation was "totally safe." Accordingly, there is no indication that Schunck's entry exceeded what he thought necessary to abate what he believed to be the fire hazard inside defendant's townhouse.

On the basis of all these facts, we conclude that Schunck acted reasonably in entering defendant's residence pursuant to an emergency call. The Fourth Amendment does not prevent firefighters responding to emergency calls from undertaking their duty to protect the public from imminent danger. However, we emphasize that the Fourth Amendment does not give firefighters a blank check to enter and search private residences, and we caution reviewing courts to apply these principles carefully in order to ensure the appropriate protection of private residences under the Fourth Amendment. The Fourth Amendment strikes a careful balance, as seen in the instant case, between a citizen's reasonable expectation of privacy with his similarly reasonable expectation that emergency personnel will act swiftly to protect his residence from the threat to persons or property therein.

### E. RESPONSE TO THE DISSENT

In addition to the responses made to the dissent throughout this opinion, we offer the following general discussion of the dissent's criticisms of our holding.

21

One of the recurring themes of the dissent is that this opinion does not address how the various community caretaking functions fit within the Fourth Amendment. The response to this criticism is simple: this case only addresses how to apply the Fourth Amendment when a firefighter enters a private residence that he believes to be under the imminent threat of fire. We leave all other variants and all other applications of the community caretaking exception for another day.

For this reason alone, the dissent's criticism of this opinion for "not wad[ing] into [the] judicial morass" of the distinctions among the community caretaking doctrine, the emergency doctrine, and the emergency aid doctrine is off the mark. Moreover, the dissent's understanding of these doctrines is needlessly complex because it characterizes them as separate and distinct exceptions to the warrant requirement, rather than as aspects of the community caretaking exception.[55] Readers can judge for themselves whether this opinion thoroughly examined the law relevant to deciding this case. The central purpose of a state court of last resort is not merely to bemoan that "the scope of [the community caretaking] exception[] is far from clear,"[56] but to establish clear principles of law,

---

[55] *Post* at 7. Notwithstanding the dissent's protestations otherwise, today's holding is consistent with other courts' applications of the community caretaking exception. For example, the Washington Supreme Court has determined the "community caretaking function exception to encompass not only the 'search and seizure' of automobiles, but also situations involving either emergency aid or routine checks on health and safety." *State v Kinzy*, 141 Wash 2d 373, 386; 5 P3d 668 (2000). Similarly, the Illinois Supreme Court recognized that "[c]ourts use the term 'community caretaking' to uphold searches or seizures as reasonable under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute." *People v McDonough*, 239 Ill 2d 260, 269; 940 NE2d 1100 (2010).

[56] *Post* at 6.

consistent with the Constitution, that subsequent courts can apply as the facts of any particular case dictate.

By contrast, the dissent would further muddle Fourth Amendment doctrine by deriving several separate exceptions to the warrant requirement based on the exercise of community caretaking functions. But if there is anything clear from the United States Supreme Court's articulation of the community caretaking exception, it is that *actions pursuant to community caretaking functions qualitatively differ from actions pursuant to criminal investigations.* This is the central basis for today's holding.

The dissent would also hold that the community caretaking exception does not apply to entry into private residences. A central part of the dissent's rationale appears to be that because the decision identifying the community caretaking exception, *Cady v Dombrowski*, "included language that sharply distinguished automobile searches from searches of private residences," the exception *cannot* encompass searches of private residences. However, the dissent can identify no United States Supreme Court decision that rejected the application of the community caretaking exception to private residences. Indeed, the dissent admits, in its discussion of the "emergency" and "emergency aid" exceptions, that firefighters acting pursuant to their community caretaking functions may, under certain circumstances, enter a private residence.

The dissent claims that this opinion "extinguishes the emergency and emergency-aid exceptions to the warrant requirement in Michigan . . . ."[57] Far from it. We recognize that these different aspects of the community caretaking exception apply the exception to

---

[57] *Post* at 20.

23

specific circumstances. Our opinion today merely recognizes that in all these circumstances, we must apply the standard of reasonableness that governs *all* Fourth Amendment cases.[58] Thus, while different circumstances will lead to different conclusions regarding the reasonableness of a particular search,[59] we are only constitutionally required to forbid *unreasonable* searches.

The reasonableness of the instant entry turns on the fact that the responding firefighters believed that there existed the imminent threat of an electrical fire in defendant's residence.[60] The firefighters reasonably believed that the danger posed an imminent threat to property or life, and they acted reasonably in abating that threat.

---

[58] The United States Supreme Court has held that if no exception to the warrant requirement applies, a warrantless search is unreasonable. *Katz*, 389 US at 357. This proxy for what constitutes a reasonable search nevertheless applies the same Fourth Amendment standard: reasonableness.

[59] As the dissent points out, *post* at 21 n 62, the *Davis* Court explained that "[w]hile categorizing these different activities under the heading of 'community caretaking functions' may be useful in some respects, it does not follow that all searches resulting from such activities should be judged by the same standard." *Davis*, 442 Mich at 25. When read in its context—following an extensive (but not necessarily exhaustive) list of different community caretaking functions—it is clear that the *Davis* Court meant simply that the circumstances of each search must be taken individually to determine whether the search was reasonable. There is no indication that the *Davis* Court meant to depart from the universal application of the reasonableness standard to all Fourth Amendment inquiries; rather, it sought to apply "standards specifically applicable to emergency aid entries." *Id.* We do not disturb the standards that the *Davis* Court applied in that context. We simply articulate standards applicable to situations in which a firefighter enters a private residence to abate what he believes to be an imminent threat of fire.

[60] The dissent criticizes this opinion for "fail[ing] to explain which community-caretaking functions, beyond responding to an emergency or administering emergency aid, would reasonably justify a warrantless entry into a home." *Post* at 21. However, any such articulation would be dicta, because it would incorporate circumstances not controlling in the instant case.

## IV. CONCLUSION

We conclude that the community caretaking exception to the Fourth Amendment's warrant requirement applies no less to firefighters than to police officers engaged in abating emergency conditions that concern the protection of life and property. Thus, first-response firefighters may avail themselves of the community caretaking exception to the Fourth Amendment's warrant requirement. In this case, the firefighter entered defendant's residence in order to abate what he reasonably believed was the imminent threat of a serious electrical fire. We conclude that he acted reasonably in doing so and that, accordingly, the circuit court and the Court of Appeals majority erroneously suppressed the evidence he discovered in plain view during this entry. We therefore reverse the circuit court's decision and the Court of Appeals judgment and remand this case to the circuit court for entry of an order denying defendant's motion to suppress and for further proceedings consistent with this opinion. We do not retain jurisdiction.

Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

25

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

No. 141009

MARK SLAUGHTER,

      Defendant-Appellee.

_____

MARILYN KELLY, J. (*dissenting*).

In my view, the majority's decision today extends the community-caretaking exception to the Fourth Amendment warrant requirement beyond discernable limitation. Therefore, I respectfully dissent.

I would affirm the Court of Appeals' judgment, which affirmed the trial court's decision to grant defendant's motion to suppress. However, I would do so based on a different analysis than that used by the Court of Appeals. Consistently with many other courts that have considered the issue, I would hold that the community-caretaking exception to the Fourth Amendment warrant requirement cannot justify a warrantless entry into a private residence. Because the majority concludes otherwise without a sufficient legal basis for doing so, I cannot join its opinion.

# I. LEGAL BACKGROUND

The Fourth Amendment of the United States Constitution protects the people from unreasonable searches and seizures.[1]  The Michigan Constitution contains a similar protection.[2]  Both constitutional provisions require a warrant supported by probable cause for searches and seizures to be reasonable, and therefore constitutional, unless an exception to the warrant requirement applies.[3]

A person's home is entitled to the most heightened Fourth Amendment protection.[4]  Thus, a warrantless entry into a home is presumptively unreasonable.[5]  It violates the Fourth Amendment unless an exception to the warrant requirement exists.

## A. EXCEPTIONS TO THE WARRANT REQUIREMENT GENERALLY

Exceptions to the warrant requirement generally relate to two important functions of law enforcement and other state actors: criminal-investigation functions and so-called "community-caretaking" functions.  The exceptions for criminal-investigation functions

---

[1] US Const, Am IV.

[2] Const 1963, art 1, § 11.

[3] See *Katz v United States*, 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967).

[4] See *Silverman v United States*, 365 US 505, 511; 81 S Ct 679; 5 L Ed 2d 734 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); see also *Kyllo v United States*, 533 US 27, 37; 121 S Ct 2038; 150 L Ed 2d 94 (2001) ("In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes.").

[5] See, e.g., *Welsh v Wisconsin*, 466 US 740, 750; 104 S Ct 2091; 80 L Ed 2d 732 (1984), citing *Payton v New York*, 445 US 573, 586; 100 S Ct 1371; 63 L Ed 2d 639 (1980).

exist because sometimes obtaining a warrant is impracticable due to the need to act expeditiously when investigating criminal activity.

Such exceptions include searches incident to lawful arrests[6] and searches conducted because of the existence of exigent circumstances, for instance, when the police are pursuing a fleeing felon.[7] Neither party to this case asserts that the warrantless entry into defendant's home occurred in the course of investigating criminal activity. Thus, none of the warrant exceptions under the criminal-investigation umbrella justify the entry.

Other exceptions to the warrant requirement further the government's interest in protecting individuals or the general public from harm. These exceptions relate to the community-caretaking functions of state actors. They are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[8] For example, an official's community-caretaking functions justify the inventory exception to the warrant requirement, which allows searches conducted according to established police procedures.[9] Community-caretaking functions also include the administration of emergency aid,[10] which provides another exception to the warrant requirement.

---

[6] *Arizona v Gant*, 556 US ___; 129 S Ct 1710; 173 L Ed 2d 485 (2009).

[7] *United States v Santana*, 427 US 38, 41-43; 96 S Ct 2406; 49 L Ed 2d 300 (1976).

[8] *Cady v Dombrowski*, 413 US 433, 441; 93 S Ct 2523; 37 L Ed 2d 706 (1973).

[9] *South Dakota v Opperman*, 428 US 364, 368-372; 96 S Ct 3092; 49 L Ed 2d 1000 (1976).

[10] *People v Davis*, 442 Mich 1, 25; 497 NW2d 910 (1993).

The firefighters in this case were investigating a potential water leak and electrical problem,[11] which is "totally divorced" from any criminal investigation. However, several of the exceptions to the warrant requirement that form part of the government's community-caretaking functions are implicated under the facts of the instant case.

Yet determining that this case implicates the community-caretaking functions of governmental actors answers only the beginning of the inquiry. As previously stated, the community-caretaking function is the foundational premise for several exceptions to the warrant requirement. Three such exceptions are significant to this case and will be discussed herein: the general community-caretaking exception, the emergency exception,[12] and the emergency-aid exception.

In discussing these exceptions, one essential distinction is paramount. Although all the exceptions fall under the rubric of an official's community-caretaking functions, they involve different circumstances, and different standards are used in assessing their

---

[11] For the reasons explained in part II(C) of this opinion, the majority's characterization of the circumstances here as an "imminent threat of fire," *ante* at 12, is inapt.

[12] There is some disagreement over whether the emergency exception is justified by community-caretaking considerations or by exigent circumstances. See, e.g., *State v Deneui*, 2009 SD 99, ¶ 22; 775 NW2d 221, 232 (2009) ("Several courts have also held that the emergency aid doctrine is a subcategory of the community caretaker exception, while the emergency doctrine is a subcategory of the exigent circumstances exception.").

However, in *Davis*, this Court made clear that the exigent-circumstances exception involves actions pursuant to criminal investigation. *Davis*, 442 Mich at 24. As previously noted, it is undisputed that the entry in this case did not occur in the course of an investigation of criminal activity.

4

application.[13]  Thus, although the exercise of community-caretaking *functions* involves many different factual circumstances, warrantless entries pursuant to the community-caretaking *exception* are justified in only a narrow subset of those circumstances.

## B.  THE "COMMUNITY-CARETAKING," "EMERGENCY," AND "EMERGENCY-AID" EXCEPTIONS

As the majority correctly states, one exception to the warrant requirement is the search of a vehicle conducted as part of a police officer's community-caretaking functions.[14]  This exception, first established in *Cady v Dombrowski*, is commonly referred to as the community-caretaking exception to the warrant requirement.[15]

A related exception also involves the exercise of community-caretaking functions, but is grounded on the need for immediate action by police or firefighters to address

---

[13] See *id.* at 25 ("Although administering emergency aid is referred to as one of the community caretaking functions of the police, this should not have any effect on the law governing the emergency aid exception.  While categorizing these different activities under the heading of 'community caretaking functions' may be useful in some respects, it does not follow that all searches resulting from such activities should be judged by the same standard.").

[14] *Cady*, 413 US at 448.

[15] See, e.g., *United States v Sanchez*, 612 F3d 1, 4 n 2 (CA 1, 2010) (citing *Cady* for the proposition that "[t]he community caretaking exception to the Fourth Amendment's warrant requirement allows the police to impound a vehicle for noninvestigatory purposes when it is reasonable to do so," and giving as an example "to remove an impediment to traffic or to protect a vehicle from theft or vandalism"); *United States v Johnson*, 410 F3d 137, 143-144 (CA 4, 2005) (noting that *Cady* established the community-caretaking exception in the context of automobile searches).

emergency situations.[16]  This exception is sometimes subdivided into the emergency exception and the emergency-aid exception.[17]

Unfortunately, the scope of these exceptions is far from clear.  Consequently, courts across the country have rendered vastly different decisions about the proper application of the community-caretaking, emergency, and emergency-aid exceptions.[18] These anomalous results stem primarily from conflicting nomenclature regarding the exceptions.[19]  The South Dakota Supreme Court recently summarized this confusion:

> A review of the caselaw reveals a breadth of decisions discussing and applying various exceptions including the emergency doctrine, the emergency aid doctrine, and the community caretaker doctrine.
>
> Some of the avowed distinctions between these three doctrines can be frail, bordering on the meaningless.  Neither have they been consistently applied, thus creating contradictory and sometimes conflicting doctrines. Some courts treat these exceptions interchangeably.  Others declare that the community caretaker exception applies, but then use law applicable to one of the other exceptions, such as the emergency doctrine.[20]

---

[16] *Michigan v Tyler*, 436 US 499; 98 S Ct 1942; 56 L Ed 2d 486 (1978) (stating that no warrant is required for firefighters to enter a residence to fight a fire in progress); *Brigham City v Stuart*, 547 US 398, 403; 126 S Ct 1943; 164 L Ed 2d 650 (2006) (stating that no warrant is required for police to enter a residence "to assist persons who are seriously injured or threatened with such injury").

[17] See, e.g., *Deneui*, 2009 SD 99, at ¶ 28; 775 NW2d at 234.

[18] The majority overlooks the fact that virtually *all* courts and commentators recognize that a distinction exists between these exceptions, even if they sometimes confuse them when applying them.  Thus, I ask the majority, does the need to "establish clear principles of law," *ante* at 22, outweigh our obligation to get those principles right?

[19] See, e.g., Decker, *Emergency circumstances, police responses, and Fourth Amendment restrictions*, 89 J Crim L & Criminology 433, 441-444 (1999) (hereinafter Decker, *Emergency circumstances*).

[20] *Deneui*, 2009 SD 99, at ¶¶ 21-22; 775 NW2d at 232.

Pursuant to *Michigan v Tyler* and *Brigham City v Stuart*,[21] it is well settled that police and firefighters may enter a private residence without a warrant in emergency circumstances. Such circumstances include, at a minimum, responding to a fire in progress and assisting injured persons in need of medical treatment.[22] However, the law remains unclear regarding the proper application of the warrant exception to actions conducted pursuant to community-caretaking functions that are not in response to an emergency situation. The United States Supreme Court has not seen fit to extend the community-caretaking exception established in *Cady* beyond the context of automobile searches. This, in my view, should be the starting point for the Court's analysis in this case.

## II. ANALYSIS

The majority does not wade into this judicial morass. Instead, it ignores it, proceeding as if the law is clear and dictates its result. In so doing, it does precisely what *State v Deneui* cautioned against: creating contradictory and conflicting doctrines using inconsistent language.[23]

For example, the majority proclaims that "the community caretaking exception applies to firefighters . . . when they are responding to emergency situations that threaten

---

[21] *Tyler*, 436 US 499; *Stuart*, 547 US 398.

[22] It is undisputed that there was no fire in progress or injured person in need of medical treatment in this case.

[23] *Deneui*, 2009 SD 99, at ¶ 22; 775 NW2d at 232.

life or property."[24] This is a correct characterization of the scope of the emergency exception to the warrant requirement, not of the community-caretaking exception.

However, the majority also states that, as long as the entry was "an exercise of [the state actor's] community caretaking functions," courts need assess only the reasonableness of the entry.[25] This suggests that a firefighter's entry into a residence pursuant to a community-caretaking function absent any imminent threat would be sanctioned as long as a court determines the entry was reasonable. This standard could conceivably be characterized as a wholly independent community-caretaking exception along the lines of that created by the United States Supreme Court in *Cady*.

However, the majority lacks an adequate legal basis for extending the community-caretaking exception discussed in *Cady* to entries of residences generally and to the facts of this case specifically. The majority relies almost exclusively on the United States Supreme Court decision in *Tyler* and our decision in *People v Davis*.[26] As I will explain, the majority's reliance on those decisions is unfortunate. *Tyler* is of nominal usefulness, and *Davis* suggests a result opposite to that reached by the majority.

---

[24] *Ante* at 1; see also *ante* at 21 ("The Fourth Amendment does not prevent firefighters responding to emergency calls from undertaking their duty to protect the public from imminent danger.").

[25] *Ante* at 12.

[26] *Tyler*, 436 US 499; *Davis*, 442 Mich 1.

## A. DOES THE COMMUNITY-CARETAKING EXCEPTION JUSTIFY WARRANTLESS ENTRIES INTO PRIVATE RESIDENCES?

The majority recognizes that the privacy of the home stands at the very core of the Fourth Amendment's protection against unreasonable searches and seizures. But it assumes without analysis that warrantless entries into a private residence to engage in community-caretaking functions are permissible if reasonable.[27] I cannot agree. The majority's conclusion assumes, without deciding, what should be the threshold question.

### 1. *TYLER* DOES NOT SUPPORT THE MAJORITY'S HOLDING

The United States Supreme Court's decision in *Tyler* did not cite or discuss *Cady*, the seminal case that created the community-caretaking exception. Nor do the words "community caretaking" appear anywhere in *Tyler*. Rather, *Tyler* is typically viewed as involving the emergency exception to the warrant requirement.[28] Yet the majority uses *Tyler* as a central basis for its holding interpreting a warrant exception that *Tyler* never mentioned. Reliance on a case involving one exception to the warrant requirement to formulate the parameters of another exception to the warrant requirement is erroneous.[29]

---

[27] See *ante* at 15.

[28] See, e.g., *Mincey v Arizona*, 437 US 385, 392; 98 S Ct 2408; 57 L Ed 2d 290 (1978) (stating that "[w]e do not question the right of the police to respond to emergency situations" by making warrantless entries and searches and citing *Tyler*); see, generally, Decker, *Emergency circumstances*, pp 441-444 (1999).

[29] The general rule is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few *specifically established* and *well-delineated* exceptions." *Katz*, 389 US at 357 (citations omitted) (emphasis added).

*Tyler* held that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'"[30] Courts construing *Tyler* have generally read this exception to the warrant requirement narrowly, confining it to situations involving an imminent need for police intervention to protect life or property.[31] Many courts have also noted that the critical inquiry is "whether there is a 'true

---

[30] *Tyler*, 436 US at 509.

[31] As noted, the United States Supreme Court has recognized as emergencies entry to fight a fire in progress and to provide immediate medical treatment (also termed the "emergency aid" exception). See *Tyler*, 436 US 499, and *Stuart*, 547 US 398.

Some federal and state courts have taken a more expansive view of what constitutes an emergency. Those courts have upheld warrantless entries under this exception to locate missing persons, stop a burglary in progress, and to respond to gunshots fired. See, e.g., *People v Wharton*, 53 Cal 3d 522; 280 Cal Rptr 631; 809 P2d 290 (1991) (upholding entry of a residence to locate a missing individual); *Carroll v State*, 335 Md 723, 731-732; 646 A2d 376 (1994) (citing federal and state cases upholding warrantless entries when the police reasonably believed that a burglary was in progress or had recently been committed); *Davis*, 442 Mich at 28 (assuming without deciding that, in most cases, the sound of gunfire could justify warrantless entry into a motel room under the emergency-aid doctrine).

By contrast, the authority supporting a warrantless entry under facts similar to those presented here is both scarce and dubious. A few cases have allowed warrantless entries in cases involving water leaks. See *State v Dube*, 655 A2d 338 (Me, 1995) (holding lawful a warrantless entry to combat a plumbing emergency and stop sewage or water from leaking into apartments below); *United States v Boyd*, 407 F Supp 693, 694 (SD NY, 1976) (upholding a warrantless entry when water was leaking from the defendant's apartment into the apartment below and the officer heard water running in defendant's apartment). But see *United States v Rohrig*, 98 F3d 1506, 1520 n 6 (CA 6, 1996) (questioning *Dube*'s conclusion that the warrantless entry was not a "search" for Fourth Amendment purposes); *United States v Williams*, 354 F3d 497, 508 (CA 6, 2003) ("Unlike the situations in *Rohrig*, *Boyd*, and *Dube* where the problem the police sought to address was certain, the possible water leak in this case was only speculative.").

---

immediacy' that absolves an officer from the need to apply for a warrant and receive approval from an impartial magistrate."[32]

Thus, *Tyler* provides a basis for concluding that firefighters may enter onto property without a warrant under emergency circumstances, such as to fight a fire in progress. However, the majority reads more into *Tyler* by concluding that it "lead[s] inexorably to the conclusion that the community caretaking exception applies to firefighters."[33] This conclusion is simply wrong. It stretches *Tyler*'s holding far beyond what that opinion actually said. In fact, *Tyler* only leads "inexorably" to the conclusion that firefighters may enter a burning building in order to fight a fire in progress.

Because *Tyler* did not discuss the community-caretaking exception, much less establish rules for its application, the majority should not have placed such reliance on it. Finally, as I explain later, I do not believe that the prosecution in this case established a factual record that justified a warrantless entry under any exception to the warrant requirement.[34]

## 2. *DAVIS* DOES NOT SUPPORT THE MAJORITY'S DECISION

With *Tyler* properly limited to emergency situations, the majority opinion is left to relying solely on our decision in *Davis*. But *Davis* does not support it either.

---

[32] *United States v Washington*, 573 F3d 279, 288 (CA 6, 2009).

[33] *Ante* at 14.

[34] See part II(C) of this opinion.

*Davis* explicitly stated that its holding was based on the emergency-aid exception, not the community-caretaking exception.[35] Thus, its discussion of the broader community-caretaking exception is dicta and is not binding on this Court. Nonetheless, to the extent that *Davis* is informative here, it points to a result the opposite of that reached by the majority.

*Davis* involved the warrantless entry of a hotel room by police officers after they received reports of gunshots being fired. In its discussion of community-caretaking functions, the Court was extremely careful to note the significant difference in privacy interests between a car and a dwelling.[36] The *Davis* Court ultimately held that the warrantless entry in that case could not be justified under the emergency-aid exception.[37] Once the *Davis* Court so held, it did not make an independent community-caretaking analysis to determine whether the warrantless entry could be justified on that basis.

---

[35] *Davis*, 442 Mich at 9 n 4 ("*Even though we resolve this case on the basis of the emergency aid doctrine*, the Court of Appeals assertion that the community caretaker function is a subcategory of the exigent circumstances doctrine requires a more general clarification of the exceptions to the warrant requirement.") (emphasis added); *id.* at 25 ("Accordingly, we hold that when the police are investigating a situation in which they reasonably believe someone is in need of immediate aid, *their actions should be governed by the emergency aid doctrine, regardless of whether these actions can also be classified as community caretaking activities*.") (emphasis added).

[36] *Id*. at 25 ("Although, for example, inventory of a car and entry into a dwelling may both be categorized as 'caretaking functions,' it does not follow that both types of activities should be judged by the same standard. It is particularly important to note that the levels of intrusion the police make while performing these functions are different. For example, a police inventory of a car is much less intrusive than a police entry into a dwelling.").

[37] Cf. *City of Troy v Ohlinger*, 438 Mich 477, 483; 475 NW2d 54 (1991) (upholding a warrantless entry into a home after an officer observed a man inside bleeding and not moving in order "to determine if [medical] assistance was required").

Hence, *Davis* created a sliding scale for assessing the reasonableness of searches undertaken on the basis of community-caretaking functions. Because of the greater Fourth Amendment protections afforded to residences, there are few community-caretaking functions that would justify a warrantless search of a residence under *Davis*. Only when governmental officials act to address an emergency and their actions meet the standard for the emergency or emergency-aid exceptions is a warrantless entry into a home proper.[38]

Two Michigan cases, *People v Toohey* and *People v Krezen*, have discussed the community-caretaking function of police officers in upholding automobile searches under the inventory exception to the warrant requirement.[39] The *Toohey* Court surveyed the United States Supreme Court's decisions in *Cady* and *South Dakota v Opperman*.[40] It noted that inventory searches of automobiles satisfy the Fourth Amendment's "reasonableness" requirement if they are "conducted pursuant to standardized police

---

[38] *Davis*, 442 Mich at 25-26 ("[W]e hold that police may enter a dwelling without a warrant when they reasonably believe that a person within is in need of immediate aid. They must possess specific and articulable facts that lead them to this conclusion."); see also *State v Ryon*, 137 NM 174, 185; 108 P3d 1032 (2005) ("Since the privacy expectation is strongest in the home, only a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge.").

[39] *People v Toohey*, 438 Mich 265, 273-276; 475 NW2d 16 (1991) (citing *Cady* for the proposition that "the United States Supreme Court has determined that the impoundment and subsequent inventory search of a vehicle is constitutionally valid as part of the caretaking function performed by the police"); *People v Krezen,* 427 Mich 681, 687; 397 NW2d 803 (1986).

[40] *Toohey*, 438 Mich at 273-277, citing *Cady*, 413 US 433, and *Opperman*, 428 US 364.

procedure . . . ."[41]  Although *Toohey* and *Krezen* discussed the community-caretaking functions of the police in impounding automobiles, neither decision discussed an independent community-caretaking exception to the warrant requirement.

In sum, no decision from this Court has expressly defined the parameters of a community-caretaking exception to the warrant requirement.  *Krezen*, *Toohey*, *City of Troy v Ohlinger*, and *Davis* all discussed the community-caretaking *functions* of law enforcement officers.[42]  But in none of those cases did the Court uphold a warrantless entry or search on the basis of the community-caretaking *exception*.  Rather, the *Krezen* and *Toohey* decisions relied on the inventory exception.  The *Ohlinger* and *Davis* decisions relied on, and fashioned a test for the application of, the emergency-aid exception.  Therefore, this Court has no controlling authority on point.

### 3.  SURVEY OF OTHER JURISDICTIONS

*Tyler* and *Davis* do not support, much less mandate, the majority's result.  Because there is no controlling Michigan authority, I turn to other jurisdictions for guidance. Many courts have observed that the *Cady* decision included language that sharply distinguished automobile searches from searches of private residences.[43]  Therefore, they

---

[41] *Toohey*, 438 Mich at 275-276.

[42] *Krezen*, 427 Mich 681; *Toohey*, 438 Mich 265; *Ohlinger*, 438 Mich 477; *Davis*, 442 Mich 1.

[43] See, e.g., *United States v Erickson*, 991 F2d 529, 532 (CA 9, 1993) ("Although it involved a community caretaking function, *Cady* clearly turned on the 'constitutional difference' between searching a house and searching an automobile.") (quotation marks and citations omitted).

14

have limited the community-caretaking exception solely to the former.[44]  Recently, the

United States Court of Appeals for the Third Circuit joined the majority of other federal

circuits and adopted this approach:

> We agree with the conclusion of the Seventh, Ninth, and Tenth
> Circuits on this issue, and interpret the Supreme Court's decision in *Cady*
> as being expressly based on the distinction between automobiles and homes
> for Fourth Amendment purposes.  The community caretaking doctrine
> cannot be used to justify warrantless searches of a home. Whether that
> exception can ever apply outside the context of an automobile search, we
> need not now decide.  It is enough to say that, in the context of a search of a
> home, it does not override the warrant requirement of the Fourth
> Amendment or the carefully crafted and well-recognized exceptions to that
> requirement.[45]

---

[44] *United States v Pichany*, 687 F2d 204, 207-209 (CA 7, 1982); *Erickson*, 991 F2d at 532; *United States v Bute*, 43 F3d 531, 535 (CA 10, 1994); *State v Gill*, 2008 ND 152, ¶ 23; 755 NW2d 454, 459 (2008); *Ryon*, 137 NM at 185.

The United States Court of Appeals for the Eleventh Circuit similarly declined to allow an entry into a private residence pursuant to the community-caretaking exception. *United States v McGough*, 412 F3d 1232, 1239 (CA 11, 2005).  However, it is unclear whether *McGough* was limited to the facts before the court or whether it established a categorical rule for searches of private residences.  Several courts have cited *McGough* for the proposition that the Eleventh Circuit, like the Seventh, Ninth, and Tenth Circuits, has declined to extend the community-caretaking exception to allow warrantless searches of private homes or businesses.  See, e.g., *Gill*, 2008 ND 152, at ¶ 17; 755 NW2d at 459.

The United States Court of Appeals for the Sixth Circuit has applied the community-caretaking exception to allow a warrantless entry of a home in order to abate a nuisance.  See *Rohrig*, 98 F3d 1506.  However, the *Rohrig* court placed great emphasis on "the fact-specific nature of this holding," *Rohrig*, 98 F3d at 1525 n 11, leaving doubts about whether it was intended to be broadly applicable.  Subsequent Sixth Circuit decisions have questioned whether *Rohrig* stands for the proposition that the community-caretaking exception can justify warrantless entries into private residences.  See, e.g., *Williams*, 354 F3d at 508 ("[D]espite references to the doctrine in *Rohrig*, we doubt that community caretaking will generally justify warrantless entries into private homes.").

[45] *Ray v Warren Twp*, 626 F3d 170, 177 (CA 3, 2010).

15

Numerous other courts have tacitly rejected extending the community-caretaking exception to warrantless entries into private residences.[46]  Similarly, others have evaluated the warrantless entry under the emergency or emergency-aid exceptions only and, finding them inapplicable, declared the entry unconstitutional without considering a broader community-caretaking exception.[47]

Cases from jurisdictions in which the courts have ostensibly permitted warrantless entries into private residences pursuant to the community-caretaking exception are also instructive.  For example, in *United States v Quezada*,[48] the Eighth Circuit upheld a warrantless entry into the defendant's apartment.  The *Quezada* Court stated that "[a] police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that *an emergency exists* requiring his or her attention."[49]

Thus, the warrantless entry in that case, like the entries in *Tyler* and *Mincey v Arizona*, was premised on an emergency situation, not simply that the officer was acting

---

[46] See, e.g., *Ortiz v State*, 24 So 3d 596, 615 (Fla App, 2009) (Orfinger, J., dissenting) ("Other than situations involving the medical emergency exception, until today, the community caretaker exception has not been applied in Florida as a separate exception to the Fourth Amendment to validate an entry into a residence.").

[47] See, e.g., *State v Ford*, 2010 VT 39, ¶¶ 11-21; ___ Vt ___, ___; 998 A2d 684, 689-692 (2010) (recognizing the existence of both the community-caretaking and emergency-aid exceptions, but holding an officer's entry into a private residence unconstitutional because it failed to satisfy the emergency-aid exception).

[48] *United States v Quezada*, 448 F3d 1005 (CA 8, 2006).

[49] *Id.* at 1007, citing *Mincey*, 437 US at 392-393 (emphasis added).

in a community-caretaking capacity.[50] Many other cases that purportedly allowed warrantless entries into homes under the community-caretaking exception similarly relied on the fact that an emergency situation was involved.[51]

Cases like *Quezada* persuasively illustrate how the law pertaining to the community-caretaking exception, the emergency exception, and the emergency-aid exception are often muddled. Courts often confuse a police officer's actions pursuant to a community-caretaking *function* with the community-caretaking *exception* to the warrant requirement. Moreover, these cases also reveal the dearth of authority for a community-caretaking exception to the warrant requirement that applies to homes independently of the emergency or emergency-aid exceptions.

The majority ignores all of this and assumes, without really deciding the issue, that community-caretaking duties can justify a warrantless entry into a private residence. This assumption is precariously based, given the dearth of authority to support it. I would hold that, to the extent an independent community-caretaking exception to the warrant requirement may be recognized in Michigan, it cannot justify a warrantless entry into a private residence. Rather, such entries must be justified by another exception, such as the emergency or emergency-aid exceptions discussed in *Tyler* and *Davis*.

---

[50] *Tyler*, 436 US 499; *Mincey*, 437 US 385; see also *Ray*, 626 F3d at 176 (stating that *Quezada* and similar cases "do not simply rely on the community caretaking doctrine established in *Cady*").

[51] See, e.g., *Deneui*, 2009 SD 99, at ¶ 80; 775 NW2d at 251-252 (Meierhenry, J., dissenting) (distinguishing cases cited by the majority as grounded in the emergency and emergency-aid exceptions, not a broader community-caretaking exception).

## 4. THE MAJORITY'S MISCONSTRUCTION OF FOURTH AMENDMENT PROTECTIONS

The majority's articulation of the general legal principles applicable to this case is generally accurate. For example, I do not dispute that the touchstone of Fourth Amendment analysis is reasonableness. The problem is that the majority opinion restricts itself to general legal principles. Indeed, a simple reason exists why the majority does not answer my refutation of *Tyler* and *Davis* as a basis for its holding or my discussion of the other caselaw: it cannot. Instead, it attempts to distract from this failure by dismissing my opinion as "bemoan[ing]" the state of the law in this area.[52] The majority also claims that my approach would "further muddle Fourth Amendment doctrine . . . ."[53] To the contrary, my analysis fully examines and evaluates the existing nuances in Fourth Amendment doctrine recognized by courts across the country, including this one. Such nuances are lost on the majority.

If, as the majority asserts, my understanding of these nuances is "needlessly complex,"[54] so too is the understanding of countless other judges and commentators. Contrary to the majority's assertion, the emergency and emergency-aid exceptions are not merely "aspects" of the community-caretaking exception.[55] As previously explained, the

---

[52] *Ante* at 22.

[53] *Ante* at 23.

[54] *Ante* at 22.

[55] See *Deneui*, 2009 SD 99, at ¶ 80; 775 NW2d at 251-252 (Meierhenry, J., dissenting) ("[T]he community caretaking *function* of police is an aspect of the emergency exception and emergency aid exception. The community caretaker *exception*, however, is an independent and broader exception to the Fourth Amendment and has not been expansively recognized by any authority outside of the context of motor vehicles.").

18

community-caretaking *functions* of police and other state actors provide the basis for several distinct exceptions to the warrant requirement. These exceptions include the inventory exception, the emergency exception, and the emergency-aid exception.[56] Each

---

[56] See *Laney v State*, 117 SW3d 854, 860-861 (Tex Crim App, 2003):

> The notion that officers act pursuant to their "community caretaker functions" serves as a basis for three separate doctrines created by the [United States] Supreme Court:
>
> 1) the emergency aid doctrine, established in *Mincey;*
>
> 2) the automobile impoundment and inventory doctrine, first conceived in *Cady,* and later expanded upon in *Opperman;* and,
>
> 3) the community caretaking doctrine, or public servant doctrine, established in *Cady,* and followed by this Court . . . .
>
> The common thread in each of these three exceptions to the warrant and probable cause requirements is the officer's purpose.
>
> The emergency doctrine is not the same as the community caretaking doctrine established in *Cady.* The distinction between the emergency doctrine and the community caretaking doctrine, hereinafter referred to as the *Cady* doctrine, is a narrow, but critical one. Under the emergency doctrine, the officer has an immediate, reasonable belief that he or she must act to "protect or preserve life or avoid serious injury." On the other hand, under the *Cady* doctrine, the officer "might or might not believe there is a difficulty requiring his general assistance." Therefore, while both doctrines are based on an officer's reasonable belief in the need to act pursuant to his or her "community caretaking functions," the emergency doctrine is limited to the functions of protecting or preserving life or avoiding serious injury. Additionally, the *Cady* doctrine deals primarily with warrantless searches and seizures of automobiles (and will be limited to those circumstances except in unusual circumstances), while the emergency doctrine deals with warrantless entries of, but is not limited to, private residences. [Citations omitted.]

19

exception is subject to a different standard for assessing whether a warrantless entry or search conducted pursuant to that exception was reasonable.[57]

The majority opinion falls short because it creates out of whole cloth a previously unrecognized community-caretaking exception to the warrant requirement. Its wholly unsupported decision not only to adopt that exception but to extend it to warrantless entries into private residences compounds this error. Moreover, the majority refuses to recognize that its stated standard for this new exception is the essence of the standard for the emergency exception to the warrant requirement. Implicit in this failure is the inevitable conclusion that, under the majority's new exception, warrantless entries into a home to perform nonemergency community-caretaking functions can be reasonable.[58]

In sum, the majority's opinion today (1) extinguishes the emergency and emergency-aid exceptions to the warrant requirement in Michigan by creating a broader community-caretaking exception with no discernable limitation,[59] (2) exposes the perils

---

[57] See *Davis*, 442 Mich at 25-26 ("[P]olice may enter a dwelling without a warrant when they reasonably believe that a person within is in need of immediate aid. They must possess specific and articulable facts that lead them to this conclusion."); *Toohey*, 438 Mich at 284 ("To be constitutional, an inventory search *must* be conducted in accordance with established departmental procedures, which all police officers are required to follow, and *must not* be used as a pretext for criminal investigation.").

[58] Thus, although the majority claims that it is not reaching this question, see *ante* at 22, 24 n 60, the dicta from its opinion are loud and clear.

[59] Under the majority's new exception, state actors never need rely on the aforementioned exceptions, as the new community-caretaking exception will always make their warrantless entry reasonable under such circumstances. Surely the unanimous *Davis* Court did not think it was wasting its time in carefully crafting a standard for applying the emergency-aid exception.

20

of distilling broad Fourth Amendment principles from inapposite authority and without comprehensive analysis, (3) pays only lip service to United States Supreme Court precedent emphasizing the difference between the home and a vehicle,[60] (4) ignores the United States Supreme Court's admonition that the warrant requirement is subject only to specifically established and well-delineated exceptions,[61] (5) directly contravenes *Davis* by applying a general reasonableness standard to all warrantless entries carried out to perform community-caretaking functions,[62] and (6) fails to explain which community-caretaking functions, beyond responding to an emergency or administering emergency aid, would reasonably justify a warrantless entry into a home.[63]

---

[60] The majority acknowledges that "the threshold of reasonableness is at its apex when police enter a dwelling pursuant to their community caretaking functions." *Ante* at 12. However, nothing else in its analysis gives any effect to this crucial distinction.

[61] *Katz*, 389 US at 357. The specifically established and well-delineated emergency-aid exception has existed in Michigan since at least 1991, see *Ohlinger*, 438 Mich 477. As previously explained, there is no Michigan authority specifically adopting a community-caretaking exception. Moreover, the community-caretaking exception established in *Cady* has not been specifically established, let alone well delineated, outside the context of automobile searches.

[62] *Davis*, 442 Mich at 25 ("While categorizing these different activities under the heading of 'community caretaking functions' may be useful in some respects, it does not follow that all searches resulting from such activities should be judged by the same standard.").

[63] I agree with the majority that there is no indication that *Davis* intended to depart from "the universal application of the reasonableness standard to all Fourth Amendment inquiries[.]" *Ante* at 24 n 59. But as the majority notes, *Davis* established a specific standard for how courts could assess reasonableness in the emergency-aid context. The majority today applies a similar standard to assess the reasonableness of entries in emergency situations, such as to abate an imminent threat of fire. However, the majority errs when it grounds its decision in the community-caretaking exception because it gives no equivalent standard applicable to warrantless entries to perform nonemergency community-caretaking functions.

21

## B. DOES THE COMMUNITY-CARETAKING EXCEPTION APPLY TO FIREFIGHTERS?

This portion of the majority's holding is unique.[64] No jurisdiction has extended the community-caretaking exception to the warrant requirement to firefighters.

As previously mentioned, *Tyler* established that firefighters are entitled to enter private residences without a warrant in emergency situations, including fighting a blazing fire. *Stuart* makes clear that police may enter homes to render emergency aid to someone inside in clear need of medical treatment.[65] Both of these exceptions are subsumed within the broader rubric of community-caretaking functions.

Because I would not allow the community-caretaking exception to justify warrantless entries into private residences by any state actors, I would not reach this issue. However, under the majority's broad new community-caretaking exception,

---

The majority claims that any such standard would be dictum because the only question here is whether a firefighter may enter a home to address the threat of an imminent fire. This would be an adequate response if the majority were applying the emergency exception, but not when it creates a new community-caretaking exception. Surely we need not decide the reasonableness of every possible emergency police officers or firefighters may encounter.

However, as previously noted, the majority's decision is based on a new community-caretaking exception without a standard in the event of a nonemergency. The majority leaves lower courts to guess when other, less urgent community-caretaking functions can reasonably justify warrantless entries and searches of homes. Our lower courts and the public deserve more.

[64] See *ante* at 14 ("*Tyler*'s holding and rationale lead inexorably to the conclusion that the community caretaking exception applies to firefighters.").

[65] I do not dispute that firefighters, as well as police officers, could also invoke the emergency-aid exception to justify a warrantless entry into a home.

22

firefighters and police officers may effectively enter private residences at any time and for virtually any reason without a warrant.

## C. APPLICATION TO THIS CASE

Under existing law, the firefighters in this case were permitted to enter defendant's townhouse only to combat an ongoing emergency. The thin factual record precludes the conclusion that a reasonable person could have believed that an emergency existed in defendant's townhouse. At best, the facts establish that a potential fire threat existed in the townhouse neighboring defendant's, which belonged to Kathleen Tunner.

The only facts that the firefighters responding to Tunner's phone call knew when they entered defendant's home were that (1) Tunner had observed water running over *her* electrical box and (2) she *thought* that she heard water running between the common wall her townhouse shared with defendant's townhouse. As the majority observes, Royal Oak Fire Department Lieutenant Michael Schunck testified that he did not independently confirm that water was running in Tunner's home. Hence, he did nothing to respond to the only possible emergency of which he was aware when he arrived—a potential fire hazard in Tunner's townhouse.[66]

In concluding to the contrary, the majority discounts the legal principle that a warrantless entry into a home is presumptively unreasonable.[67] The government bears

---

[66] Even Tunner did not consider the situation in her townhouse to be an imminent hazard. She first attempted to contact her next-door neighbor and the management company to address the water issue. Only when the management company told her there was nothing it could do did Tunner call the fire department.

[67] See, e.g., *Welsh*, 466 US at 750, citing *Payton*, 445 US at 586.

23

the burden of proving that a "'carefully delineated'" exception to the warrant requirement applies.[68]

Indeed, the facts justifying the entry in this case are significantly less compelling than those present in *Davis*. In *Davis*, the police had received a radio dispatch informing them that the manager at a motel had reported hearing gunshots fired in or near one of two motel rooms. The dispatcher identified two possible rooms and directed police officers to a possible witness, but did not suggest that any person was injured. With this dispatch as their only source of information, the police arrived at the motel and proceeded to one of the two rooms. Once there, they encountered an occupant who was unwilling to open the door.

Notably, the police had not themselves heard shots fired. Nor did they interview any witnesses who heard them, not even the desk clerk, whom the dispatcher had identified as the source of the information. The initial source of information gave very little detail about the situation. The record did not indicate that the police made inquiries of the manager who approached them or that they knocked on other doors. They encountered no circumstances that suggested that shots had in fact been fired. Under these facts, the *Davis* Court unanimously refused to apply the emergency-aid exception to uphold the warrantless entry.

Thus, *Davis* involved a situation in which gunshots had been fired—a situation specifically recognized by courts as falling within the emergency exception.[69] Yet the

---

[68] *Welsh*, 466 US at 749-750, quoting *United States v United States Dist Court*, 407 US 297, 318; 92 S Ct 2125; 32 L Ed 2d 752 (1972).

[69] See Decker, *Emergency circumstances*, pp 480-484.

*Davis* Court refused to apply the exception absent police corroboration of the shots independent of the phone call.

This case involves an alleged water leak and potential electrical problem—not a scenario specifically recognized as falling within the emergency exception. Just as in *Davis*, however, the warrantless entry was carried out without any independent corroboration that water was actually leaking and causing a potential electrical problem in defendant's home. If there was no water leaking, there was no electrical problem and hence no emergency or imminent threat to life or property. Therefore, there was no exception to the warrant requirement that justified the warrantless entry in this case.

The majority concludes to the contrary by establishing a broad, undefined new community-caretaking exception to the warrant requirement wholly unsupported by existing law. Indeed, the scope of the majority's newly created exception to the warrant requirement is limitless.

Finally, I question the legal significance of at least one of the facts the majority finds significant when evaluating the reasonableness of the warrantless entry. The majority contends that because the townhouse complex contained several units attached to one another, this fact "elevated the imminence of the potential hazard."[70] Not so. Certainly, the fact that the townhouse complex has numerous attached units elevated the potential *scope* of the fire threat and the number of people who potentially might have been affected. But that fact is utterly irrelevant to the imminence of a fire threat from water running over an electrical box. The question of the *imminence* of a fire might be

---

[70] *Ante* at 19.

25

influenced by whether someone saw sparks flying from the box or saw a large quantity of water flowing over it. But the scope of the threat and the imminence of the threat are distinctly different inquiries.

For these reasons, I agree with the Court of Appeals' conclusion that it is impossible to determine whether the firefighters acted reasonably in entering defendant's apartment. Thus, I would hold that the prosecution did not meet its burden of establishing that an exception to the Fourth Amendment warrant requirement justified the firefighters' entry.

## III. CONCLUSION

I dissent from the majority's decision to extend the community-caretaking exception to the warrant requirement to allow entry into private residences. I would hold that firefighters, as well as police officers, may enter a private residence only pursuant to the emergency and emergency-aid exceptions. The prosecution failed to establish a record indicating that the firefighters in this case reasonably believed that immediate entry into defendant's townhouse was necessary to address an emergency situation. Therefore, I would affirm the judgment, but not the reasoning, of the Court of Appeals.

Marilyn Kelly
Michael F. Cavanagh

26